*1101
 
 OPINION
 

 Per Curiam:
 

 The State tried and convicted Edward Bennett of murder with use of a deadly weapon, attempted murder with use of a deadly weapon, and attempted robbery with use of a deadly weapon. The jury returned a sentence of death. We affirmed Bennett’s conviction and sentence on direct appeal and Bennett thereafter petitioned the district court for post-conviction relief. The district court dismissed the petition citing various procedural deficiencies. In addition, the district court concluded that the arguments raised in Bennett’s petition were belied or repelled by the trial record. For the reasons that follow, we affirm the district court’s order dismissing Bennett’s petition.
 

 FACTS
 

 The full array of facts surrounding the commission of the crimes for which Bennett was convicted are contained in our opinion resulting from Bennett’s direct appeal.
 
 See
 
 Bennett v. State, 106 Nev. 135, 787 P.2d 797 (1990). For the crimes recounted therein, Bennett was tried and convicted of murder with use of a deadly weapon, attempted murder with use of a deadly weapon, attempted robbery with use of a deadly weapon, and was sentenced to death. On direct appeal, we affirmed Bennett’s conviction and sentence,
 
 see id.,
 
 and the remittitur from this court was issued on October 23, 1990.
 

 On November 1, 1990, Bennett filed in proper person a petition for post-conviction relief alleging ineffective assistance of trial counsel, a motion for appointment of counsel for post-conviction proceedings, and a motion for leave to proceed in forma pauperis. The district court granted Bennett’s motion to proceed in forma pauperis, appointing Lizzie R. Hatcher, Esq., to represent him in the post-conviction proceeding, and continued the matter until November 19, 1990, for confirmation of counsel.
 

 At the scheduled hearing, Hatcher was confirmed as counsel for Bennett. However, no further proceedings were calendared with respect to Bennett’s petition for post-conviction relief. Approximately
 
 three years and one month later,
 
 on December 30, 1993, Bennett, through Hatcher, filed a second document entitled “Petition for Post Conviction Relief,” alleging sixteen separate instances of cumulative, prejudicial error and ineffective assistance of counsel. Bennett alleged that his counsel either failed to present pertinent evidence helpful to his defense or failed to object to inappropriate argument by the prosecution. The
 
 *1102
 
 specific allegations of error forming the basis of Bennett’s request for a new penalty hearing are fully addressed in the discussion section of this opinion.
 

 The State moved for dismissal of the petition, primarily on the procedural bases of untimeliness,
 
 see
 
 NRS 34.726(1), 34.800(1); waiver,
 
 see
 
 NRS 34.810; and “law of the case.” The district court heard counsels’ arguments and subsequently granted the State’s motion by minute order. The district court later issued an order including findings of fact and conclusions of law, wherein the court commented:
 

 This Court not only finds that this Petition should be dismissed as a result of Edward Bennett’s procedural default, but additionally finds as a matter of law that all of the issues raised by him in his petition are belied or repelled by the trial record of these proceedings. Naked claims for relief which are repelled by the record do not entitle a defendant to an evidentiary hearing or to the relief he seeks.
 

 Bennett moved the district court for rehearing, which the court denied, thus prompting this appeal.
 

 DISCUSSION
 

 Treating his 1993 petition as a supplement to his original petition filed in 1990, Bennett argues that NRS 34.726, which mandates the filing of post-conviction relief petitions for a writ of habeas corpus within one year of the remittitur of the direct appeal from this court, did not apply since his petition antedated the effective date of the statute. Alternatively, Bennett argues that good cause for the delay exists, because (1) the delay was not his fault, and (2) the dismissal of the petition for untimeliness would unduly prejudice him. Finally, Bennett contends that the only way to properly review his allegations of ineffective assistance of trial counsel is to have an evidentiary hearing, which the district court improperly refused to order. Moreover, Bennett maintains that his failure in prior proceedings to raise many of the issues addressed in his petition is evidence of the validity of his ineffective assistance of counsel claim.
 

 The State counters by distinguishing the petition filed in 1993 from the petition filed in 1990, insisting that the dismissal of the 1993 petition was appropriate on procedural grounds for lack of timeliness. The State concedes, however, that Bennett may seek relief pursuant to his 1990 petition, which has been languishing in the district court for the past four years.
 

 The State also argues that Bennett cannot show cause and prejudice to excuse the procedural flaws of his petition for reasons including the following: (1) he has had an opportunity to argue his case on direct appeal; (2) he still has at his disposal the
 
 *1103
 
 federal habeas corpus process; (3) it would be fundamentally unfair to the State for this court to excuse a delay of such length that induced the dismissal by the district court pursuant to NRS 34.800; (4) many contentions raised in the petition are procedurally barred by the law of the case established on direct appeal; and (5) many of the claims in the 1993 petition have been waived, because they either have been or could have been raised previously.
 
 See
 
 34.810(l)(b). Finally, the State contends that Bennett should not be allowed to present evidence of his claim of ineffective assistance of counsel at an evidentiary hearing because, in addition to the procedural flaws mentioned above, a review of the merits reveals that no such claim is sustainable.
 
 See
 
 Hargrove v. State, 100 Nev. 498, 502, 686 P.2d 222, 225 (1994) (naked claims for relief which are belied or repelled by the record do not entitle a defendant to an evidentiary hearing).
 

 Although Bennett waited over three years to proceed to hearing on his post-conviction remedy, he filed his initial petition in a timely manner, and it was only after counsel was appointed that the three-year delay transpired. In fairness to Bennett, we decline to penalize him on the basis of a delay that apparently was not his fault.
 
 See
 
 NRS 34.726(1)(a).
 

 Although there appears to be merit to the State’s insistence that Bennett has not demonstrated good cause for failing to raise certain issues in prior proceedings and for revisiting issues that have already been decided by this court, whether Bennett can show cause for doing so is related to his ineffective assistance of counsel allegations. Furthermore, whether Bennett can show prejudice from the dismissal of his petition is intricately related to the merits of his claims. Without expressly addressing the remaining procedural bases for the dismissal of Bennett’s petition, we therefore choose to reach the merits of Bennett’s contentions, which are clearly lacking for the most part and, in terms of those allegations of arguable merit, do not otherwise warrant a new penalty hearing.
 

 Arguing Theories of Penology
 

 The prosecution argued below that because this is a murder case, “rehabilitation isn’t the operative word.” The prosecution also argued that the jury should consider deterrence in deciding on the appropriate sentence. Finally, the prosecution compared the facts of Bennett’s case with the hypothetical facts of other murder cases in which the State did not seek the death penalty, attempting to highlight relevant distinctions.
 

 Bennett contends that ruling out rehabilitation as an option, insisting that capital punishment is a deterrent to crime, and comparing the facts of his case with the facts of others in which
 
 *1104
 
 capital punishment was not sought, was prejudicial prosecutorial misconduct. The reasons offered in support of Bennett’s contentions are that (1) the prosecutor’s opinion on whether someone can be rehabilitated tainted the jury and took the option of a life sentence out of their hands; (2) there is no evidence that capital punishment deters crime, and he should be entitled to state funds to hire expert assistance to prove it; and (3) the comparison cases used to support the prosecutor’s subjective opinion that capital punishment is appropriate in this case were “outside the record” and irrelevant.
 

 The State counters that the comments on rehabilitation, deterrence, and the propriety of the death penalty were an appropriate prosecutorial practice, sanctioned by this court in Jimenez v. State, 106 Nev. 769, 772, 801 P.2d 1366, 1368 (1990), wherein we held:
 

 In the instant case, Jimenez complains that the prosecutor injected his own opinion concerning gradations of first degree murder and the differing degrees of punishment that each may justify. The prosecutor’s argument was not improper. We have previously recognized the right of a prosecutor in a penalty phase hearing to discuss “general theories of penology, such as the merits of punishment, deterrents and the death penalty.” Ybarra v. State, 103 Nev. 8, 15, 731 P.2d 353, 358 (1987). Here, the prosecutor presented hypotheticals apparently or approximately based upon actual cases to the jury as examples of criminal conduct not warranting the death penalty. The prosecutor was thus contrasting the circumstances of the hypothetical cases with those of the instant case in order to illustrate the qualitative differences between the crimes and to suggest a basis for imposing the harsher penalty against Jimenez. The prosecutor’s argument represented proper persuasion rather than improper inflammation.
 

 Our views on the prosecution’s right to discuss general theories of penology, such as the merits of punishment, deterrents and the death penalty, have remained firm. The above comments by the prosecutor in the instant case, as in
 
 Jimenez,
 
 focus on general theories of penology, which constituted proper argument rather than inflammatory discourse. Accordingly, we conclude that Bennett’s contentions respecting the prosecutor’s comments on the propriety of the death penalty are without merit.
 

 Paraphrasing Evidence
 

 During the penalty phase, the prosecutor stated: “We have
 
 *1105
 
 evidence from the lips of the Defendant that he and his accomplice were on a killing spree.” In fact, Bennett did not testify that he was on a killing spree. Rather, a witness, Jeff Chidester, testified that Bennett told him that he was on a killing spree.
 

 Bennett contends that the prosecutor did not stay within the strict confines of the law and the facts, because Bennett did not personally testify that he was on a killing spree. The State’s response insists that Bennett’s argument is specious, as the evidence that Bennett and Beeson were on a killing spree actually came from Bennett’s mouth, as described by witness Jeff Chidester.
 

 The test with respect to inappropriate comments by the prosecution is whether the comments ‘“so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). Based upon that standard, we must reject Bennett’s contention. Arguably, the prosecution misstated the “evidence” in a technical sense; however, the distinction is subtle and relatively minor in light of the overwhelming evidence that Bennett was, in fact, on a killing spree. Consider, for example, the content of the poetry discussed in the next section. Moreover, Bennett’s trial counsel successfully countered the prosecution’s argument by telling the jury that the testimony actually came from Jeff Chidester.
 

 In light of defense counsel’s statement and the strength of the prosecution’s case as a whole in terms of the propriety of the death penalty, we conclude that this argument supplies Bennett with no basis for a new penalty hearing.
 

 Questionable Commentary and Injection of Personal Opinion
 

 During a search of Bennett’s house, evidence described as poetry or lyrics of some sort were seized and determined by an expert to be in Bennett’s handwriting. On direct appeal, Bennett challenged the admissibility of the poetry. We concluded that the search giving rise to the seizure of the poetry was lawful because Bennett’s father voluntarily let the police officers inside the house.
 
 Bennett,
 
 106 Nev. at 140, 787 P.2d at 800. Moreover, the police entry and search were lawfully conducted pursuant to a properly executed search warrant.
 
 Id.
 
 Because the police officers were lawfully present where the poetry was seen, and the discovery of the poetry was inadvertent, the seizure of the poetry was justified pursuant to the plain view doctrine, even though it was not listed in the search warrant.
 
 Id.
 
 Bennett renewed his challenge to the admissibility of the poetry in his petition for post-
 
 *1106
 
 conviction relief, and for the same reasons expressed in our opinion on direct review, we again reject Bennett’s position.
 

 In his petition, Bennett challenged various prosecutorial arguments based on the content of the poetry. Relevant extractions from the poetry read as follows:
 

 (1) “There’s a problem in this country and has a lot to do with being white. There’s too many people with ugly skin.”
 

 (2) I need to kill somebody or tear someone apart. I got to satisfy my need, cure this thirst for blood. So as I make the sacrifice by doing it just for you and kill this child, for it is a first born, I’m giving you my soul, Satan. Where is my reward? My thirst for blood is now calm, but it shall rise again. My power is so strong I need to cause some death. For Lucifer’s inside of me, and I don’t want to let him out. I look in the mirror, I see him in my eyes. I feel his heart beating in my chest, and I know it is not mine. For I feel so privileged for I’m with number one. I’m so f-’ powerful and my reigning has just begun as I kill and kill again. I feel my rewards come on. My power’s growing even greater. I’m so f-’ strong for I am the devil’s right-hand man. I carry out his every chore. I make this sacrifice in his name, Lucifer the Great, blood splattered on my face from the kill I’ve just done.”
 

 (3) “Someone gonna, someone’s gonna die.”
 

 Based on the subject matter of the poetry, the prosecutor argued that “in my perspective,” in light of victim Derrick Franklin, who is black, the poetry indicates an attitude of white supremacy. The prosecutor also argued that the murder committed by Bennett was “a random, ritualistic, satanic execution.” Finally, the prosecutor argued that Bennett’s own words condemned him, commenting that the jurors “have it within their power to make sure that the defendant’s prophecy that someone is going to die is never fulfilled again.”
 

 Unrelated to the poetry, the prosecutor also commented: “Our society doesn’t like loose cannons like this running around on our streets.” Furthermore, the prosecution suggested that the victim’s brain had been turned into “pulp” and that, although Bennett did not have to look at what he had done except to “gloat,” Bennett picked up her head and said he could see all the way through it. Finally, the prosecution declared to the jury, “In a real sense, I represent Michelle Moore [the victim].”
 

 Bennett contends that the above prosecutorial arguments were inflammatory, prejudicial, and not supported by the evidence, the cumulative effect of which mandates a new penalty hearing.
 

 
 *1107
 
 However, the State insists that the comments were appropriate. Specifically, (1) the “in my perspective” remark was merely rhetorical, and the poetry seized in Bennett’s room indeed supports an inference of a white supremacist attitude and a “ritualistic, satanic” connection; (2) the likelihood that Bennett might kill again and the argument referring to the jury’s power to see that Bennett does not was supported by the evidence; (3) the “loose cannon” and “pulp”/“gloat” comments were appropriate based on the evidence presented at trial; and (4) the comment that the State represents the victim was insignificant — as the defense “diligently tries to turn everything upside down and portray the accused as the victim, someone needs to represent the victim and someone needs to reiterate that the case at bar is being tried because the victim was murdered.”
 

 In our view, the above prosecutorial comments were not improper. Even assuming that the “in my perspective” prelude to the prosecutor’s white supremacist comment and the comment concerning the State’s representation of the victim were improper, which is arguable,
 
 [1]
 
 they were nevertheless harmless. As this court noted on Bennett’s direct appeal, “where, as here, a guilty verdict is ‘free from doubt, even aggravated prosecutorial remarks will not justify reversal.’ ”
 
 Bennett,
 
 106 Nev. at 141, 787 P.2d at 800 (quoting Yates v. State, 103 Nev. 200, 206, 734 P.2d 1252, 1256 (1987)). Our reasoning applies equally to the propriety of the imposition of the death sentence, which, on the basis of the compelling array of evidence before the jury, is clearly justified, despite what may be viewed as some questionably proper remarks by the prosecutor.
 

 Moreover, the challenged interpretations of the evidence by the prosecutor does not lend support to Bennett’s cause. First, the poetry seized in Bennett’s room does, in fact, support an inference that Bennett had white supremacist tendencies and that the murder committed by Bennett was ritualistic and satanic. Second, this court concluded on Bennett’s direct appeal that the prosecutor’s comment, “You possess the power to guarantee that Edward Bennett will never again make a healthy, vibrant, caring woman
 
 *1108
 
 into a corpse,” was not improper because there was evidence in the record to support an inference of future dangerousness.
 
 See Bennett,
 
 106 Nev. at 141, 787 P.2d at 801. The prosecutor’s argument at issue in this appeal remains the same argument that we have previously determined to have been proper. Third, referring to Bennett as a “loose cannon,” to the victim’s head as “pulp,” and to Bennett’s act of gloating over the deceased victim, was a proper interpretation of the evidence presented at trial and not otherwise improper or prejudicial.
 

 Failure to Explore Mitigating Factors
 

 Bennett contends that his trial counsel “failed to investigate and present experts dealing with [his] mental, and psycho-social state thereby resulting in an inadequate consideration of the mitigating circumstances.” He also argues that his counsel failed to present any evidence of the possibility of his rehabilitation. Of course, such claims of ineffective assistance of counsel must be reviewed under the “reasonably effective assistance” standard articulated by the Court in Strickland v. Washington, 466 U.S. 668 (1984), which requires a defendant to show that counsel’s assistance was “deficient” and that the deficiency prejudiced the defense.
 
 Id.
 
 at 687.
 

 The State contends that there is simply no legal standard that requires a psycho-social evaluation of the defendant in every capital case. The State also notes that Bennett’s father gave emotional and convincing testimony concerning his son’s background, and that the jury determined that Bennett had established three mitigating factors: (1) no prior criminal history, (2) his youthful age, and (3) alcohol and drug usage. As the State observes, the jury did consider Bennett’s psycho-social status in terms of these mitigating factors.
 

 The strategy of Bennett’s trial counsel conformed to the standard set forth in
 
 Strickland.
 
 Bennett’s counsel elicited poignant mitigating testimony and, even absent a “psycho-social” evaluation of Bennett, counsel’s representation was not deficient. As the
 
 Strickland
 
 Court noted: “Judicial scrutiny of counsel’s performance must be highly deferential. ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” 466 U.S. at 689.
 

 Bennett’s counsel performed effectively in the face of overwhelming evidence of guilt and aggravating circumstances. It is difficult to imagine what Bennett’s counsel could have done differently in order to obtain a more favorable verdict. We there
 
 *1109
 
 fore conclude that there is no merit to Bennett’s contentions regarding the failure of his trial counsel to present the aforementioned mitigating factors to the jury.
 

 Weighing of Mitigating and Aggravating Circumstances
 

 The district court instructed the jury on the interaction between mitigating and aggravating circumstances as follows:
 

 The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
 

 Otherwise, punishment imposed shall be imprisonment in the state prison for life with or without the possibility of parole.
 

 Bennett insists that the jury should have been instructed more clearly that under no circumstances are they obligated to impose the death penalty, even if aggravating circumstances outweigh mitigating circumstances.
 

 The State counters that the instruction incorporates almost verbatim NRS 175.554 and was approved of in Riley v. State, 107 Nev. 205, 808 P.2d 551 (1991). In
 
 Riley
 
 we held:
 

 While “may” can be interpreted to mean “shall,” if the context of the word requires as much, generally the word “may” is not to be construed to create a requirement, but rather, is construed to signify the ability to choose or the power to act.
 
 See
 
 Gyler v. Mission Insurance Company, 514 P.2d 1219, 1220 (Cal. 1973).
 

 Riley,
 
 107 Nev. at 217, 808 P.2d at 558;
 
 see also
 
 Canape v. State, 109 Nev. 864, 884-85, 859 P.2d 1023, 1036 (1993) (Steffen, J., concurring).
 

 Consistent with our holding in
 
 Riley,
 
 we conclude that the above jury instruction accurately informed the jury of their statutorily endowed prerogative to decide whether Bennett would live, regardless of whether aggravating circumstances outweighed mitigating circumstances. “May” is clearly permissive in the context of NRS 175.554(3) and the instruction submitted to the jury.
 

 We nevertheless recognize a potential for abuse as prosecutors may, for the purpose of obscuring the clear legislative intent underlying our capital sentencing statute, favor the slightly less unambiguous language of NRS 175.554(3) at the expense of a more explicit instruction. Because of the unique gravity of the death penalty, there is no sound reason why juries should not be
 
 *1110
 
 fully advised of their constitutional prerogatives with respect to capital cases. As we observed in Gallego v. State, 101 Nev. 782, 790-91, 711 P.2d 856, 862-63 (1985), the death penalty is only a sentencing
 
 option
 
 if, after balancing and evaluating the aggravating and mitigating circumstances, the former are found to outweigh the latter.
 

 Simply stated, district courts should plainly instruct juries in capital cases that irrespective of the predominance of aggravating circumstances over mitigating circumstances, the jury still has the discretion to return a penalty other than death. Although we conclude that the jury in the instant case was adequately instructed, we direct the district courts to henceforth provide instructions that will satisfy the concerns expressed herein, thereby more precisely reflecting the public policy of this state.
 

 Bennett’s final contention challenging the constitutionality of his sentence on Eighth and Fourteenth Amendment grounds, which is essentially an amalgam of all issues discussed above, is meritless.
 

 CONCLUSION
 

 For the reasons discussed above, we conclude that the district court did not err in dismissing Bennett’s petition for post-conviction relief. In addition to apparent procedural flaws in Bennett’s petition, a review of the merits reveals no basis for granting Bennett a new penalty hearing or an evidentiary hearing for the purpose of exploring further the adequacy of Bennett’s representation at trial. We therefore affirm the district court’s dismissal of Bennett’s post-conviction petition for relief.
 
 [2]
 

 [1]
 

 We held in
 
 Jimenez
 
 that “prosecutors must be free to express their perceptions of the record evidence and inferences properly drawn therefrom. We have simply directed them to do so without using such expressions as ‘I personally believe,’ or ‘In my opinion,’ so as to in effect place their own certification on their arguments.” 106 Nev. at 772, 801 P.2d at 1367-68. Furthermore, we concluded in Nevius v. State, 101 Nev. 238, 248, 699 P.2d 1053, 1059 (1985), that the prosecutor’s request that the jury return the death penalty on behalf of the victim and himself was improper.
 

 [2]
 

 The Honorable Miriam Shearing, Justice, voluntarily recused herself from participating in the decision of this appeal.