OPINION
By the Court,
Shearing, J.:
Appellant Roy Hollaway strangled his wife, Carolyn Whiting, on January 27, 1996. The couple had been arguing for days and drinking heavily when Hollaway strangled Whiting, first with his hands and then with an electrical cord. Hollaway then called 911 and reported the crime. He admitted the crime to the 911 operator and to police after they arrived. Whiting was in a coma and died about two weeks later. The State charged Hollaway with first-degree murder and sought the death penalty. Hollaway chose to represent himself, and at trial he offered no defense. After the jury found him guilty, he offered no mitigating evidence and asked for and received a death sentence.
Pursuant to this court’s order, the district court appointed counsel to represent Hollaway on appeal. Counsel challenges Hollaway’s death sentence on a number of grounds. We conclude that these grounds are meritless, but pursuant to our mandatory review of the death sentence, we conclude that Hollaway’s sentence was imposed under the influence of prejudicial and arbitrary factors. We therefore vacate the sentence and remand for a new penalty hearing.

FACTS

On March 22, 1996, the State filed an information charging Hollaway with murder. Hollaway pleaded not guilty at his arraignment on March 26, 1996. On April 15, 1996, the State filed a notice of intent to seek the death penalty, alleging as a single aggravating circumstance that Hollaway was convicted of second- *736 degree armed robbery and false imprisonment in California in 1990.[1]
On August 13, 1996, Hollaway’s counsel moved the district court for a competency hearing. In an attached affidavit, counsel informed the court that Hollaway consistently “expressed a desire to receive the death penalty’ ’ and had been severely depressed and despondent.
On October 11, 1996, several defense motions were filed. One moved to allow Hollaway to represent himself and to allow the public defender to withdraw. Another moved to withdraw his plea of not guilty and to plead guilty to first-degree murder. Attached was an affidavit by Hollaway, stating that he did not want a trial and wanted to proceed directly to sentencing. Defense counsel also filed a motion to set a hearing to determine Hollaway’s competency. Attached were, among other things, evaluations of Hollaway by psychiatrist William O’Gorman, M.D., and psychologist Lewis Etcoff, Ph.D.; a transcript of a police interview of Hollaway after his arrest; a transcript of his call to 911; and copies of letters from Hollaway to family and friends after the crime. In the letters, Hollaway expressed regret over killing Whiting. For example, in a letter to his mother, he told how he and Whiting had been drinking all day and arguing, that he “lost it” and “came completely unglued” and killed her, that there was no excuse for it, and that he would regret it the rest of his life; he also asked his mother to call and try to comfort Whiting’s mother. Hollaway also exchanged letters with Whiting’s mother and expressed his regret.
Dr. O’Gorman concluded that Hollaway was clinically depressed and “should be more carefully evaluated with an Electroencephalogram (EEG) that may show evidence of disturbance of stream of consciousness, under the influence of alcohol.” O’Gorman concluded, however, that Hollaway’s depression did not render him incompetent to stand trial. Dr. Etcoff, while recognizing Hollaway’s desire to die as a part of Hollaway’s clinical depression, agreed that Hollaway was competent to stand trial.
O’Gorman and Etcoff both testified before the district court at a hearing on October 30, 1996. After their testimony, Hollaway told the court that he preferred the death penalty to thirty to forty years in prison. In responding, the court said that it had not prejudged the case but had seen worse murders where defendants did not get the death penalty. It told Hollaway that he was probably wrong if he thought a three-judge panel would automatically sentence him to death and that an average jury might be more likely to return a death sentence.
*737 On December 5, 1996, the district court found that Hollaway was not competent to understand the charges against him and to aid in his own defense and ordered him committed to Lakes Crossing Center for a determination of his ability to attain competency. On April 3, 1997, after reviewing the reports of a sanity commission, the court found Hollaway competent to stand trial. At that time, Hollaway told the court that he no longer wanted to plead guilty but preferred to go to trial.
At a hearing on April 17, 1997, the district court canvassed Hollaway regarding his motion to represent himself. The court took the matter under consideration and strongly urged Hollaway to try antidepressant medication in the meantime.[2] Hollaway admitted that he wished to represent himself in order to receive the death penalty. At a hearing on May 29, 1997, the court ruled that Hollaway had a right to represent himself and relieved the public defender as counsel. Hollaway also rejected standby counsel.
The guilt phase of the jury trial began on October 27, 1997, and ended the next day. During jury selection, the State and Hollaway each used peremptory challenges to strike venire members who expressed hesitation about having to judge another person or return a death sentence. During the trial, Hollaway made no objections, asked only a handful of questions on cross-examination, presented no evidence, and made no argument.
During the guilt phase the 911 operator who took Hollaway’s call on the night of January 27, 1996, testified as follows. Hollaway called and said that his wife would not die despite his repeated efforts to strangle her over a thirty-minute period. He said that he considered using a knife but that was too messy. He also said that he and his wife had been fighting for about three days. When told that the conversation was being recorded, Hollaway said, “Cool. I did this deliberately because I wanted her to die. . . . [I]f that don’t get me the death penalty, I reckon nothing will.” Portions of the taped call were played to the jury.
A Las Vegas Metropolitan Police Department (LVMPD) officer was dispatched to Hollaway’s apartment after the call and testified to the following. Hollaway told the officer that he had killed his wife. The officer found Whiting lying on the apartment floor. Hollaway told the officer that he had tried to drown her, then choked her with his hands, and then because he was not strong enough used an electrical cord. Medical personnel arrived, tried to resuscitate Whiting, and then took her from the apartment on a gurney. Hollaway was in the patrol car with the officer and “said something to the effect that, T can’t believe the bitch is still alive.’”
*738 A second LVMPD officer who arrived at the apartment that night testified. Hollaway also told this officer how he had tried to drown his wife, strangle her manually, and then used an electrical cord. He said he did so because he believed that she was cheating on him with another man. After Hollaway was put in the patrol car, he began to beat his head on the window between the front and the back seat: “He was—he was going pretty ballistic, banging his head on the window; he was pretty distraught.” When Hollaway saw his wife on the gurney, “[h]e said, ‘Don’t tell me the bitch isn’t dead, by god, she had better be dead.’ ”
Whiting died two weeks after the strangling. The doctor who performed the autopsy found that she had died from asphyxiation due to strangulation and that her brain had liquefied due to lack of blood supply.
An LVMPD detective conducted an audiotaped interview of Hollaway the night of his arrest. The detective testified regarding the interview, but the tape was not played during the guilt phase. The detective told the jury that Hollaway said he and Whiting “had been drinking and arguing and at a point he snapped and said, ‘Fuck it, you gotta die.’ ’ ’ Hollaway said that they had been arguing for several days and that Whiting had been comparing him to her ex-husband, which he hated. He stated that he first choked her with his hands, then resorted to an electrical cord, and stopped only when he was exhausted. When the detective asked if alcohol had impaired his thinking, Hollaway said, “‘No, I ain’t copping that plea.’ ”
Whiting’s mother testified. During her testimony, she stated that she and Hollaway had exchanged letters after her daughter’s death and that Hollaway “admitted what he did and he was sorry.”
The jury found Hollaway guilty of first-degree murder. The penalty hearing was held the next day, October 29, 1997. The State first played the entire tape of the 911 call and then the tape of the interview of Hollaway by the detective. The complete tapes contained additional statements of Hollaway demonstrating his appreciation of the consequences of his conduct and his desire to face up to what he had done, as well as more details about the arguments and drinking that preceded the strangulation.
(911 Tape)
Hollaway: Miss. Look, I know I’m going to prison. I have the door open. It’s not locked. Police can come in. I’m not violent.
911 Operator: I just hope your wife’s not dead.
*739 Hollaway: Well, truth to tell, now, I kinda hope she ain’t either.
(Voluntary Statement)
Hollaway: We had been arguing for several days. Although today was ... I never actually planned on killin’ her ‘til tonight. And then she . . . Fuck, I just had enough. Fuck it. I just killed her.
Detective: Are you remorseful about what happened?
Hollaway: I don’t know, I think I’m still in kind of in shock.
Detective: Okay. Have you been drinkin’ tonight?
Hollaway: Yes, I have.
Detective: Okay. When had you stopped drinkin’ prior to the, uh, fight? How long had it been since your last drink before the fight?
Hollaway: Well, we sit . . . we were both sittin’ in the house havin’ a beer.
Detective: So you were drinking up to the time—
Hollaway: Right.
Detective: —right to the fight.
Hollaway: Correct.
Detective: Okay. Once again, is there anything else you’d like to add to this that I may not have asked you? That may clear this up? Before we conclude the interview.
Hollaway: What is there to clear up? You know, there ain’t nothin’.
Detective: Okay.
Hollaway: Stupid fucked up. Now I pay the price.
Joanna Stutheit, a friend of Whiting’s, testified. She worked at a bar and liquor store and saw Whiting and Hollaway daily. On two occasions, she saw Hollaway grab Whiting’s throat and choke her. One time was at the bar; Whiting was angry with Hollaway *740 and argued with him for forty-five minutes to an hour before he attacked her; another man pulled Hollaway away. Stutheit could not remember why the other incident, at the liquor store, occurred; Hollaway stopped choking Whiting after other people told him to. Stutheit said that Whiting was sometimes verbally abusive to Hollaway: “There was times where she’d call him stupid and she’d just humiliate him.”
Richard Ziemelis testified. He had lived next door to Hollaway and Whiting. About one month before the fatal assault, Hollaway and Whiting had argued in their apartment. Ziemelis went into their apartment, found Hollaway choking Whiting, and pulled him off of her. Another time, when Ziemelis asked Whiting about the cracked windshield in her car, Whiting said that she had argued with Hollaway and he had slammed her head into the windshield.
Dolores Killmer, another friend of Whiting’s, testified. One time she was visiting Whiting, and Whiting and Hollaway had been drinking. Hollaway began choking Whiting in the bedroom, and Killmer had to pull him off of her.
The State presented evidence of Hollaway’s prior conviction and rested. Hollaway presented no evidence.
In his opening statement during the penalty phase, prosecutor David Barker informed the jury that Hollaway’s blood alcohol level was .13 percent, and the lab report was entered into evidence. In closing argument, however, the prosecutors did not mention Hollaway’s intoxication and argued that no mitigating circumstances existed.
During closing argument, prosecutor Laura Rehfeldt reminded jurors of the testimony by Whiting’s mother and the pain that Whiting’s death had caused her family. Rehfeldt said: “There will be no more holidays the family spends with their daughter and their sister, Carolyn Whiting.”
In his closing argument, Hollaway told the jury that he was in disciplinary lock-up. He claimed that this was because he was a threat to other prisoners, and he implied that he might kill again. There was no evidence presented during trial or anywhere else in the record to support Hollaway’s assertion that he was in disciplinary lock-up or that the jail considered him a threat to other inmates.
During final closing argument, as prosecutor Barker was stressing to the jury how violent Hollaway was, an electronic stun belt that Hollaway was wearing was activated and shocked him, completely disrupting the proceedings. The jury was excused, and the district court stated that it was “intolerable that this can happen by accident when he’s doing absolutely nothing.” When the jury returned, the court explained that Hollaway was wearing a stun belt and emphasized that he had done nothing to warrant its activation. The prosecutor then finished his argument.
*741 The jury retired to its deliberations and returned a verdict of death. The jury found one aggravating circumstance—Hollaway had been previously convicted of a felony involving the use or threat of violence—and no mitigating circumstances. The district court imposed the sentence of death on December 15, 1997.
The district court clerk sent this court the record on appeal, pursuant to NRS 177.055(1). Pursuant to this court’s order, the district court appointed counsel to represent Hollaway in' this appeal.

DISCUSSION

I. Issues raised by way of appeal
In his briefs to this court, Hollaway[3] argues that the right to self-representation is not unqualified, particularly in the penalty phase of a capital case, and that the district court erred in not appointing counsel to act as a friend of the court and present mitigating evidence. He also argues that the failure to present mitigating evidence frustrated the State’s statutory capital sentencing scheme. Finally, he claims that NRS 177.055(2) is unconstitutional.
Hollaway cites no authority that requires a court to appoint standby counsel. He does cite authority holding that courts have the discretion to appoint such counsel, and this court has so held. Harris v. State, 113 Nev. 799, 804, 942 P.2d 151, 155 (1997). Harris also states that a defendant who elects to represent himself does not have a constitutional right to advisory counsel and the court has no duty to appoint such counsel. Id. Furthermore, in this case Hollaway rejected the district court’s express offer to appoint standby counsel. Therefore, the court did not err in failing to appoint standby counsel for Hollaway. Regarding the failure to present mitigating circumstances, this court has ruled that a capital defendant may waive the right to do so. See Colwell v. State, 112 Nev. 807, 811, 919 P.2d 403, 406 (1996).
Hollaway claims that NRS 177.055(2) unconstitutionally precludes this court from considering mitigating evidence when reviewing a death sentence. This claim is meritless. NRS 177.055(2)(d) requires this court to consider: “Whether the sentence of death is excessive, considering both the crime and the defendant.” (Emphasis added.) This provision not only permits *742 but requires this court to consider any mitigating evidence when determining whether a death sentence is excessive.
II. Mandatory review of the death sentence: the influence of prejudicial and arbitrary factors
NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:
(b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(d) Whether the sentence of death is excessive, considering both the crime and the defendant.
We are also cognizant that because the death penalty is unique in its severity and irrevocability, this court must carefully review every death sentence to minimize the risk that the penalty is imposed in error or in an arbitrary and capricious manner. Cf. Spaziano v. Florida, 468 U.S. 447, 460 n.7 (1984).
Pursuant to NRS 177.055(2)(c), we conclude that imposition of Hollaway’s sentence was improperly influenced in three ways. We therefore set aside Hollaway’s sentence and remand for a new penalty hearing. See NRS 177.055(3).
First, during his final closing argument the prosecutor was asking “how deep, deep into this man’s being does this violence run,” when Hollaway’s electronic stun belt was set off. This completely disrupted the proceedings, requiring the jurors to leave the courtroom. When they returned, they were informed that Hollaway was wearing an electronic stun belt. The timing could not have been better to reinforce the image of Hollaway as an extremely violent man with whom authorities had to take exceptional security precautions.[4] Hollaway did absolutely nothing to justify the belt’s activation, and though it was apparently accidental, the State was solely responsible for the accident. Although the district court did its best to allay any prejudice arising from this incident, the incident remained an arbitrary and prejudicial factor which requires reversal of Hollaway’s sentence.
Second, the prosecutor’s statement to the jury that Whiting’s family would have no more holidays with their daughter and their sister was improper. See Quillen v. State, 112 Nev. 1369, 1382, *743 929 P.2d 893, 901 (1996). The statement encouraged the jury to impose a sentence under the influence of passion: “holiday arguments” are meant only to appeal to jurors’ emotions and arouse their passions. Id.
Third, under the circumstances of this case, we conclude that the jury required further instruction regarding its responsibilities in assessing the evidence during the penalty phase.
The record before us exhibits sufficient evidence to support the conviction for first-degree murder. However, it also reveals a number of potential mitigating factors. For example, there was substantial evidence that Hollaway was remorseful following the murder. There was extensive evidence that alcoholic intoxication played a major role in the crime. The record also showed that Hollaway and Whiting had been arguing incessantly when the killing occurred. Further, the crime did not threaten or endanger any other persons. Also, Hollaway did not flee or conceal the crime in any way or deny his actions; rather, he immediately reported the crime and admitted his guilt.
None of this in any way excuses or justifies Hollaway’s crime, nor does any of this necessarily render Hollaway death “ineligible,” but it could provide a basis for jurors to find the crime mitigated and impose a less severe sentence. As explained below, due to Hollaway’s refusal to present any case in mitigation, the prosecutors’ arguments, and the jury instructions, jurors may have erroneously concluded they were not required or even permitted to determine for themselves whether any mitigating circumstances existed. Even where no mitigating circumstances are presented at the penalty phase, the jurors may consider any evidence presented in the guilt phase that may indicate that a penalty less than death is appropriate.
At the end of the penalty phase, in Hollaway’s only statement to the jurors, he told them: “As far as the special verdict for the mitigating circumstances, defense is not alleging any mitigating circumstances, so I don’t see that you need to bother with that at all.” The prosecutors also argued that no mitigating circumstances existed. In final closing argument, the prosecutor told the jurors: “If you determine that there are not mitigating circumstances, and he has offered none and told you there are none, simply sign the form with no checks in any of the boxes or on any of the lines.” This is what the jury did.
The jury was not instructed in the penalty phase that statements, arguments, or opinions of counsel or a party were not evidence in the case and that regardless of such statements, argu *744 merits, or opinions, its deliberations were to be governed by the evidence as it understood and remembered it and by the law as given it by the court. Cf. Flanagan v. State, 112 Nev. 1409, 1420, 930 P.2d 691, 698 (1996). The instructions directed the jury to determine whether any mitigating circumstances existed, but also informed the jury that it only needed to consider evidence “that the Defendant proffer[s] as a basis for a sentence less than death.”
The United States Supreme Court has held that to ensure that jurors have reliably determined death to be the appropriate punishment for a defendant, “the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant’s background and character or the circumstances of the crime.” Penry v. Lynaugh, 492 U.S. 302, 328 (1989). In Penry, the absence of instructions informing the jury that it could consider and give effect to certain mitigating evidence caused the Court to conclude that
the jury was not provided with a vehicle for expressing its “reasoned moral response” to that evidence in rendering its sentencing decision. Our reasoning in [Lockett v. Ohio, 438 U.S. 586 (1978), and Eddings v. Oklahoma, 455 U.S. 104 (1982),] thus compels a remand for resentencing so that we do not “risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.’ ’
Id. (quoting Lockett, 438 U.S. at 605). That same risk compels us to remand for resentencing here.
If upon remand the State again seeks a death sentence and in all future cases where the death penalty is sought, we direct that the following jury instruction be given.
In determining whether mitigating circumstances exist, jurors have an obligation to make an independent and objective analysis of all the relevant evidence. Arguments of counsel or a party do not relieve jurors of this responsibility. Jurors must consider the totality of the circumstances of the crime and the defendant, as established by the evidence presented in the guilt and penalty phases of the trial. Neither the prosecution’s nor the defendant’s insistence on the existence or nonexistence of mitigating circumstances is binding upon the jurors.
III. Instruction regarding the proper use of evidence during the penalty phase
We are also concerned that the jury receive clear instruction regarding the proper use of evidence introduced by the State which goes beyond proof of a statutory aggravating circumstance.
*745 “[A] State’s capital sentencing scheme . . . must ‘genuinely narrow the class of persons eligible for the death penalty.’ ” Arave v. Creech, 507 U.S. 463, 474 (1993) (quoting Zant v. Stephens, 462 U.S. 862, 877 (1983)). To implement this narrowing function, in 1977 the Nevada Legislature passed and the Governor approved Senate Bill No. 220, which established the procedures by which capital punishment may be imposed in this state. See S.B. 220, 59th Leg. (Nev. 1977). Basically, three types of evidence are relevant at the penalty hearing when the State seeks a death sentence: evidence relating to aggravating circumstances, mitigating circumstances, and “any other matter which the court deems relevant to sentence.” NRS 175.552(3).
Statutes and this court’s case law make clear the nature and use of the first two types of evidence. Aggravating circumstances are expressly enumerated by statute, and only evidence relevant to these enumerated aggravators will serve to establish a defendant’s eligibility for the death penalty. See NRS 200.030(4)(a); NRS 200.033; Middleton v. State, 114 Nev. 1089, 1116-17 & n.9, 968 P.2d 296, 314-15 & n.9 (1998), cert. denied, 120 S. Ct. 322 (1999). A mitigating circumstance can be any circumstance “relative to the offense, defendant or victim” which a juror considers mitigating. See NRS 175.552(3); NRS 200.035(7); Evans v. State, 112 Nev. 1172, 1204, 926 P.2d 265, 285 (1996).[5] Aggravating evidence and mitigating evidence, of course, also entail relevant rebuttal evidence: a defendant can offer evidence to rebut the State’s proof of aggravating circumstances, as can the State to rebut proof of mitigating circumstances.
Under Nevada’s capital sentencing scheme, two things are necessary before a defendant is eligible for death: the jury must find unanimously and beyond a reasonable doubt that at least one enumerated aggravating circumstance exists, and each juror must individually consider the mitigating evidence and determine that any mitigating circumstances do not outweigh the aggravating. *746 Geary v. State, 114 Nev. 100, 105, 952 P.2d 431, 433 (1998). Even if the jury as a whole finds aggravating circumstances and every juror determines that mitigating circumstances either do not exist or do not outweigh the aggravating, the defendant is only death-eligible. The jury must then decide on a sentence unanimously and still has discretion to impose a sentence less than death. See NRS 175.554(2), (3); NRS 175.556; Bennett v. State, 111 Nev. 1099, 1109-10, 901 P.2d 676, 683 (1995).
We are concerned here with explaining the nature and use of the third type of evidence, permitted by NRS 175.552(3), concerning “any other matter which the court deems relevant to sentence.” Because evidence relevant to mitigation is broadly defined, this provision is of little practical benefit to the defendant. Normally, NRS 175.552(3) serves to permit the State to introduce evidence against the defendant which goes beyond the enumerated statutory aggravators, but this “other matter” evidence is restricted in its scope and use. It must be relevant, and its danger of unfair prejudice must not substantially outweigh its probative value. McKenna v. State, 114 Nev. 1044, 1051-52, 968 P.2d 739, 744 (1998), cert. denied, 120 S. Ct. 342 (1999). To be relevant, like mitigating evidence, it must relate “to the offense, defendant or victim.” See NRS 175.552(3). Furthermore, under Nevada’s statutory sentencing scheme, the State can offer this evidence for only one purpose: for jurors to consider in deciding on an appropriate sentence after they have determined whether the defendant is or is not eligible for death.
“Other matter” evidence is not admissible for use by the jury in determining the existence of aggravating circumstances or in weighing them against mitigating circumstances. See Middleton, 114 Nev. at 1116-17 & n.9, 968 P.2d at 314-15 & n.9. Such use of this evidence would undermine the constitutional narrowing process which the enumeration and weighing of specific aggravators is designed to implement. We therefore direct the district courts at capital penalty hearings to ascertain the purpose for which the State offers any evidence and to inform the jury of the evidence’s proper use. Three purposes are proper: to prove an enumerated aggravator, to rebut specific mitigating evidence, or to aid the jury in determining the appropriate sentence after any enumerated aggravating circumstances have been weighed against any mitigating circumstances. When the State offers evidence for the last purpose, the court must admonish the jury that the evidence is not to be used in determining the existence or the weight of aggravating circumstances. Once the jurors determine whether or *747 not the defendant is death-eligible, then they must consider all the relevant evidence to determine the appropriate sentence for the defendant. See id.

CONCLUSION

The Eighth Amendment requires that the death penalty “be imposed fairly, and with reasonable consistency, or not at all.” Eddings, 455 U.S. at 112. We believe that capital trials in this state normally result in fair and reasonably consistent imposition of the death penalty. In this case, with the unprovoked electric shocking of a capital defendant at his penalty hearing in the presence of jurors and with the lack of an instruction affirmatively informing the jurors of their responsibility to independently assess all the evidence in considering mitigation, we cannot conclude that this constitutional requirement was met.
Therefore, we affirm Hollaway’s judgment of conviction but reverse his sentence and remand for a new penalty hearing consistent with this opinion.
Agosti and Becker, JJ., concur.

Hollaway robbed a gas station attendant at knife point. After serving approximately 18 months in prison, he was paroled. He had successfully completed his parole prior to strangling his wife.

There is no indication that Hollaway ever did so.

Hollaway’s appointed counsel actually raises the issues on appeal because Hollaway himself is not actively pursuing the appeal.

In actuality, the jail had just received the stun belt device and was testing it by routinely putting it on first-degree murder defendants.

In Evans, we approved the following jury instruction:
The mitigating circumstances which I have read for your consideration are given only as examples of some of the factors you may take into account as reasons for deciding not to impose a sentence of death on the defendant. Any aspect of the defendant’s character or record and any of the circumstances of the offense, including any desire you may have to extend mercy to the defendant, which a jury believes is a basis for imposing sentence less than death may be considered a mitigating factor. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case.
Evans, 112 Nev. at 1204, 926 P.2d at 285-86.