**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT YBARRA, JR.,
*Petitioner-Appellant,*

v.

E.K. MCDANIEL, Warden,
*Respondent-Appellee.*

No. 07-99019

D.C. No.
CV-00-00233-
ECR/RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Senior District Judge, Presiding

Argued and Submitted
May 5, 2011—Pasadena, California

Filed September 6, 2011

Before: Barry G. Silverman, Richard C. Tallman, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Tallman

16849

**COUNSEL**

Michael Pescetta (argued), Assistant Federal Public Defender, Las Vegas, Nevada, for petitioner-appellant Robert Ybarra, Jr.

Robert E. Wieland (argued), Senior Deputy Attorney General, State of Nevada, Reno, Nevada, for respondent-appellee E.K. McDaniel.

**OPINION**

TALLMAN, Circuit Judge:

Over thirty years ago, petitioner Robert Ybarra, Jr., was convicted and sentenced to death for the 1979 kidnapping, rape, and murder of sixteen-year-old Nancy Griffith in her hometown of Ely, Nevada. The Nevada Supreme Court affirmed his conviction and sentence on direct appeal. After Ybarra was denied state post-conviction relief, he petitioned

the United States District Court for the District of Nevada for a writ of habeas corpus. He now appeals the district court's denial of habeas relief.

Ybarra challenges the following four district court rulings for which a certificate of appealability (COA) has been granted: (1) the dismissal of several of his claims as procedurally barred under Nevada State law; (2) the dismissal for failure to exhaust his claim that he was denied his constitutional right to an impartial jury; (3) the denial on the merits of his claim that an unconstitutionally vague jury instruction at the penalty phase violated his constitutional rights; and (4) the denial on the merits of his claim that the cumulative effect of errors in the state court proceedings denied him due process. Ybarra also challenges the following district court rulings for which no COA has been granted: (5) the district court's requirement that he abandon his unexhausted claims; (6) the dismissal of his prosecutorial misconduct claim for failure to exhaust and the denial on the merits of his claim that his counsel was ineffective for failing to object to the alleged prosecutorial misconduct; and (7) the denial on the merits of his claim that his counsel was ineffective for failing to voir dire the jury on the insanity defense.

As to the certified claims, we hold that the district court erred by dismissing as unexhausted Ybarra's claim for denial of an impartial jury, but, after receiving supplemental briefing from the parties, we deny this claim on the merits. We affirm the district court on the other three claims. As to the uncertified claims, we grant a COA on the prosecutorial misconduct claim because the district court erred by finding this claim unexhausted, but we also deny that claim on the merits. We deny a COA on the remaining two uncertified claims. Therefore, Ybarra is not entitled to habeas relief.

# I

On the evening of September 28, 1979, victim Nancy Griffith and her girlfriend met Ybarra in Ely, Nevada. After the

three drove around town in Ybarra's truck, Ybarra dropped off Griffith's friend at her request. Griffith never returned home. On the morning of September 29, 1979, she was discovered by two local men, horribly burned and with a deep gash in her shoulder but still alive, lying by the side of the road on the outskirts of Ely in White Pine County, Nevada. After a deputy sheriff was summoned, Griffith was able to tell him that she had been raped by a man in a red truck who worked north of where she had been found. Griffith died later that day in a Salt Lake City hospital burn unit.

Crime scene investigators found a quarter-mile trail of burned skin and clothing marking the path Griffith had crawled from a desert wash to the road. In the vicinity, investigators found signs of a struggle, as well as a gas can with Ybarra's fingerprints on it, boot prints that matched Ybarra's boots, and tire tracks that matched the tires on Ybarra's truck. In addition, Griffith's fingerprints were found on a beer can at Ybarra's mobile home. An autopsy showed that she had recently had sexual intercourse and had suffered trauma to her genital area and a severe blow to the head. Her death had been caused by burns that covered 80% of her body and seared her respiratory passages. Burn patterns indicated that a flammable liquid had been poured onto Griffith and ignited while she was standing or sitting, meaning that she was likely conscious at the time.

Ybarra was arrested that same day and charged one week later with murder, kidnapping, and sexual assault. After he was found competent to stand trial, Ybarra initially pled not guilty, but later changed his plea to guilty by reason of insanity. His trial began in Ely on March 31, 1980, and the jury was sworn on April 7, 1980.

Ybarra immediately moved for a change of venue on the grounds that he could not obtain an impartial jury in White Pine County, which had a population of about 8,000 people at the time. Voir dire questioning had revealed that all of the

prospective jurors had been exposed to news coverage of the crime, and nine of the twelve empaneled jurors were acquainted with Griffith or her family. After the trial court denied the motion, Ybarra filed an interlocutory appeal to the Nevada Supreme Court, which was denied on October 8, 1980.

When trial resumed on June 9, 1981, Ybarra argued that he suffered from brain damage and mental illness and that he had killed Griffith while under the delusion that he had to sacrifice her to Satan so that his ex-wife would return to him. On June 24, 1981, the jury convicted Ybarra of first-degree murder, kidnapping, and sexual assault. On June 27, 1981, he was sentenced to death after a penalty hearing. The Nevada Supreme Court affirmed his conviction on direct appeal on March 28, 1984. *See Ybarra v. State*, 679 P.2d 797 (Nev. 1984), *cert. denied*, 470 U.S. 1009 (1985).

In 1985, Ybarra filed his first state petition for post-conviction relief, which was denied by the Nevada Supreme Court on January 21, 1987. *See Ybarra v. State*, 731 P.2d 353 (Nev. 1987). Ybarra then filed a federal habeas corpus petition on March 16, 1987. At his request, it was dismissed without prejudice on February 29, 1988. After Ybarra's second state petition was dismissed by the Nevada Supreme Court on June 29, 1989, he again filed a federal habeas petition on August 14, 1989, including both exhausted and unexhausted claims. On March 31, 1993, the district court dismissed that petition without prejudice to allow Ybarra to again return to state court to fully exhaust his claims, but warned him that upon his return to federal court he should bring only exhausted claims. On April 22, 1993, Ybarra filed his third state petition. The Nevada Supreme Court dismissed the entire petition on July 6, 1999, finding his claims to be procedurally barred under Nev. Rev. Stat. § 34.800.

Ybarra then filed a pro se federal habeas petition on July 28, 2000. Pursuant to a district court order, it was amended on

September 20, 2002, after the appointment of a federal public defender. The amended petition is the subject of this appeal. As to this petition, the district court has issued four relevant orders. On July 27, 2004, it dismissed several of Ybarra's claims as procedurally barred. In that order, the district court enforced its 1993 order by requiring Ybarra to abandon his unexhausted claims or face dismissal of his entire petition. After Ybarra abandoned the unexhausted claims, the district court addressed the remaining claims on the merits and denied habeas relief on October 31, 2006.

Ybarra then filed a motion for reconsideration arguing, among other things, that the district court should reach his previously abandoned claims because they had since been exhausted in state court pursuant to a fourth state petition filed in 2003 and denied by the Nevada Supreme Court on November 28, 2005. On December 13, 2006, the district court denied the motion for reconsideration. Finally, on January 16, 2007, the district court granted in part and denied in part a COA. This appeal followed.

## II

We review de novo the district court's denial of habeas relief, *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005), and "[w]e may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale," *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our review of Ybarra's habeas petition. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Under AEDPA, we may not grant habeas relief unless the state court proceedings resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d). Factual determinations made by a state court are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. *Id.* § 2254(e)(1).

## III

We begin by addressing the claims for which the district court granted a COA.

### A

First, Ybarra contends that the district court erred by dismissing as procedurally barred certain of the claims in his federal habeas petition (claims 4, 6, 7, and 14) originally presented to the Nevada state courts in his third state post-conviction petition. The Nevada Supreme Court had dismissed Ybarra's entire third state post-conviction petition under Nev. Rev. Stat. § 34.800, a statutory laches rule imposing a rebuttable presumption that prejudice to the State sufficient to warrant dismissal exists if a petition is filed more than five years after the conclusion of direct appeal.[1] Ybarra's third

---

[1]In relevant part, Nev. Rev. Stat. § 34.800 provides:

(1) A petition may be dismissed if delay in the filing of the petition:

(a) Prejudices the respondent or the State of Nevada in responding to the petition, unless the petitioner shows that the petition is based upon grounds of which the petitioner could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the State occurred;

. . .

(2) A period exceeding 5 years between the filing of . . . a decision on direct appeal of a judgment of conviction and the filing of a petition challenging the validity of a judgment of conviction creates a rebuttable presumption of prejudice to the State. In a motion to dismiss the petition based on that prejudice, the respondent or the State of Nevada must specifically plead laches. The petitioner must be given an opportunity to respond to the allegations in the pleading before a ruling on the motion is made.

state post-conviction petition was filed on April 26, 1993, more than nine years after his conviction had been affirmed by the Nevada Supreme Court on direct appeal on March 24, 1984. The Nevada Supreme Court found that Ybarra had failed to rebut the presumption of prejudice to the State arising from this delay.

**[1]** Federal habeas review is barred for any claims dismissed by a state court pursuant to a state procedural rule that is adequate to support the judgment and independent of federal law. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Ybarra argues that section 34.800 is not "adequate" to bar federal review because it was not "clear, consistently applied, and well-established at the time of the petitioner's purported default" as required by our precedent. *See Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994).

**[2]** We have previously addressed the adequacy of Nevada's timeliness rules, including section 34.800, and held that Nevada "consistently applies its procedural rules to bar review of the merits of an untimely claim in the absence of a showing of cause and lack of prejudice to the State." *Moran v. McDaniel*, 80 F.3d 1261, 1270 (9th Cir. 1996). However, a procedural rule's adequacy is not necessarily determined by our court once and for all time. The rule's adequacy as to any particular petitioner must be assessed as of the date of that petitioner's purported default. *See Fields v. Calderon*, 125 F.3d 757, 760-61 (9th Cir. 1997) (noting that a petitioner must have fair notice of the procedural rule at the time when his claim should have been raised). Therefore, a petitioner can show that a rule deemed adequate in one case is inadequate as to his case because it was not consistently or regularly applied at the time of his particular default. *See Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998).

**[3]** Ybarra, however, cannot make such a showing here. The date of Ybarra's default—the date by which he needed to file his petition in order to avoid a presumption of prejudice

to the state under section 34.800—was 1989, five years after the Nevada Supreme Court's denial of his direct appeal. *Moran* relied on a 1984 Nevada Supreme Court laches case to hold that a petitioner who defaulted in 1992 had sufficient notice of the possibility of dismissal for delay under section 34.800. *See* 80 F.3d at 1269 (citing *Groesbeck v. State*, 679 P.2d 1268, 1269 (Nev. 1984)). Ybarra's default happened during the same time frame, so *Moran's* adequacy analysis applies to his case. Because we find no ground on which to distinguish *Moran*, we are bound by it. Therefore, section 34.800 is an adequate and independent state procedural rule that bars our review.[2] Ybarra does not argue that he can show cause and prejudice or actual innocence sufficient to overcome this procedural bar. *See Coleman*, 501 U.S. at 750. Therefore, we affirm the district court's dismissal of Ybarra's claims 4, 6, 7, and 14.

**B**

Ybarra next asserts that the district court erred by dismissing as unexhausted his claim that the state court's denial of his motion for a change of venue deprived him of his constitu-

---

[2]Ybarra argues that we should reassess *Moran* in light of our holding in *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003), that the State has the ultimate burden of proving the adequacy of a procedural rule once a petitioner puts the rule at issue "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id.* at 586. However, we are not persuaded that the litany of cases cited by Ybarra puts the adequacy of section 34.800 at issue. In the only cited case in which the Nevada court declined to apply section 34.800 when it was invoked by the State, the delay in filing was less than five years, so no presumption of prejudice arose. *See Bennett v. State*, 901 P.2d 676, 679 (Nev. 1995). The fact that there may be cases in which the court declined to sua sponte apply section 34.800 even after a five-year delay does not suggest inconsistency given that the rule expressly requires the State to specifically plead the laches defense. *See* Nev. Rev. Stat. § 34.800(2). Absent a showing that the Nevada court has declined to apply the rule even when the State so pleads, Ybarra has not put its adequacy at issue.

tional right to an impartial jury (claim 3). We agree with Ybarra that the claim was, in fact, exhausted, but we deny the claim on the merits.

## 1

**[4]** A federal court cannot grant habeas relief unless a petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In general, "exhaustion of state remedies requires that petitioners fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and citation omitted). Regardless of whether or how a petitioner has presented a claim, however, that claim has been exhausted if the state courts have in fact ruled on its merits. *See Sandgathe v. Maass*, 314 F.3d 371, 377 (9th Cir. 2002) ("Where a court has in fact ruled on a claim, there is no possibility of friction between the state and federal court systems caused by the unseemliness of a federal district court's overturning a state court conviction without the state court's having had an opportunity to correct the constitutional violation in the first instance." (internal quotation marks, alterations, and citation omitted)); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002) ("When the [state] Supreme Court here actually passed on the merits, it took its opportunity to address the federal claim."). It is clear from the record that the Nevada Supreme Court did in fact rule on the merits of the change of venue claim in 1980 after Ybarra raised it in an interlocutory appeal, as Nevada law at that time required him to do. *See* Nev. Rev. Stat. §§ 2.090(2), 2.110 (1980). Therefore, the claim has been exhausted.

## 2

**[5]** Because Ybarra's claim was exhausted, we proceed to

assess its merits.**³** Ybarra argues that the denial of his change
of venue motion deprived him of his right to an impartial jury,
given the sensational nature of the crime and White Pine
County's population at the time of less than 8,000 residents,
many of whom were acquainted with the victim's family. All
of the prospective jurors had been exposed to media coverage
of the crime, and at least 9 of the 12 empaneled jurors knew
Griffith or her family. However, the Nevada Supreme Court's
decision involved neither an unreasonable application of
Supreme Court precedent nor an unreasonable determination
of the relevant facts based on the evidence presented. *See* 28
U.S.C. § 2254(d).

The Nevada Supreme Court relied primarily on *Murphy v.
Florida*, 421 U.S. 794 (1975), when it denied Ybarra's inter-
locutory appeal. In *Murphy*, a defendant accused of a robbery
argued that extensive pretrial news coverage of the robbery,
his arrest, and his past notorious crimes (including the theft of
the Star of India sapphire from a New York museum) had
deprived him of a fair trial. 421 U.S. at 795-96. However, the
United States Supreme Court rejected the proposition that
"juror exposure to information about a state defendant's prior
convictions or to news accounts of the crime with which he
is charged alone presumptively deprives the defendant of due
process." *Id.* at 799. The Court refused to equate juror impar-
tiality with a lack of any preconceptions about the defendant
or the case. *Id.* at 800 ("'To hold that the mere existence of
any preconceived notion as to the guilt or innocence of an
accused, without more, is sufficient to rebut the presumption

---

**³**Remand to the district court is unnecessary, because there can be no
additional factfinding by the district court. Federal habeas review "is lim-
ited to the record that was before the state court that adjudicated the claim
on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). We
may affirm on any ground supported by this record. *See Downs v. Hoyt*,
232 F.3d 1031, 1036, 1039 (9th Cir. 2000) (assessing merits of habeas
claim that the district court had dismissed as procedurally defaulted). We
have reviewed the supplemental briefs on the merits of the claim that we
ordered the parties to file after oral argument.

of a prospective juror's impartiality would be to establish an impossible standard.' " (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

Instead, the United States Supreme Court held that a rebuttable presumption of impartiality normally attached if the juror could provide assurances that he or she could " 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Id.* at 800 (quoting *Irvin*, 366 U.S. at 723). The defendant could rebut this presumption by demonstrating that the juror actually held a biased opinion. *Id. Murphy* also acknowledged that, a juror's assurances notwithstanding, prejudice might be presumed "where the general atmosphere in the community or courtroom is sufficiently inflammatory," or when "most veniremen will admit to a disqualifying prejudice," such that it is probable that the community harbors "sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id* at 802-03.

**[6]** Applying *Murphy*, the Nevada Supreme Court reasonably determined that none of the circumstances signaling unconstitutional juror partiality were present in Ybarra's case. It noted that the jurors had all assured the court that they could render a fair verdict based on the evidence presented. It also found that there was no evidence of excessively biased or inflammatory news coverage suggesting an "utterly corrupted" trial atmosphere, *id.* at 798, nor any evidence indicating that any of the empaneled jurors harbored an actual bias based on their exposure to news coverage or acquaintance with Griffith or her family. These factual findings are entitled to a presumption of correctness, and, as explained below Ybarra has presented no clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

Ybarra suggests that voir dire statements by two of the nine empaneled jurors who were acquainted with Griffith's family provided inadequate assurances of impartiality. One of these

jurors could only assure the court that she would "try my hardest to be fair," and another acknowledged that "it is pretty difficult" knowing that he would see Griffith's family in the future, but "certainly I would try to keep that from entering my mind." However, a review of the full context of these statements persuades us that the Nevada courts reasonably concluded that the juror's assurances were adequate. For example, when these jurors were asked if they would be comfortable having a juror with their mindset on the jury if they were in Ybarra's place, both unequivocally answered "Yes."

As to the news coverage, Ybarra's briefing itself concedes that it "was not as inflammatory as it could have been, because it did not focus on inadmissible evidence, nor was its tone as vehement as that at issue in other [Supreme Court] cases." We agree, and this is exactly why the Nevada court's conclusion was not unreasonable under those cases. *Cf. Irvin*, 366 U.S. at 725 (holding that media coverage was prejudicial when "a barrage of newspaper headlines, articles, cartoons, and pictures was unleashed against [the defendant] during the six or seven months preceding his trial"); *Rideau v. Louisiana*, 373 U.S. 723, 725-26 (1963) (holding that media coverage was prejudicial when a 20-minute film of a defendant's confession had been shown on television three times prior to trial). Most of the coverage of Ybarra's case simply reported the facts of the crime and the pretrial proceedings. The most inflammatory item Ybarra points to, an editorial praising the recent execution of a convicted murderer, does not once refer to Ybarra's case.

Ybarra also claims that the number of prospective jurors dismissed for bias demonstrated an unacceptably high level of community hostility towards Ybarra. Of the 111 people summoned for the venire, 52 were dismissed for cause because they admitted to having fixed opinions about the case due to news coverage or personal relationships. While we recognize that this is a higher percentage than the 20 out of 78 venire members dismissed for bias that Murphy found constitution-

ally acceptable, it is still not "most" of the venire as *Murphy* requires to defeat the presumption of impartiality accorded to jurors who assert that they can be fair. 421 U.S. at 803. Furthermore, it is a significantly lower percentage than the 268 of 430 venire members dismissed for bias that the Supreme Court held to be too high in *Irvin v. Dowd*, 366 U.S. at 727. On direct review, the numbers presented by Ybarra might make this case a close one, but on habeas review, we cannot say that they render the Nevada Supreme Court's decision objectively unreasonable.

Finally, Ybarra argues that several statements overheard by jurors indicate that community sentiment was so poisoned against Ybarra that a fair trial was impossible. For example, one juror overheard a comment in a store that "if he's not guilty there will be an uprising," and another heard a comment that "you'd better hang that dirty bastard."[4] Notably, however, both of these jurors claimed that they were unaffected by these expressions. Furthermore, these comments do not show that the Nevada courts unreasonably concluded that community hostility was not so excessive as to impeach the jurors' assertions of impartiality. Distinguishable are cases in which the Supreme Court has found that public opinion created a "circus atmosphere" that was "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy*, 421 U.S. at 799. For example, in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Supreme Court held that a defendant was denied due process when, among other things, jurors "were thrust into the role of celebrities," had their pictures and addresses published, were "ex-

---

[4]While Ybarra did not present this evidence during his interlocutory appeal, he did present it to the Nevada courts on post-conviction review. Therefore, we consider it as part of the relevant state court record. *See Cullen*, 131 S. Ct. at 1409-10 (considering evidence presented to the state court at trial as well as during state post-conviction proceedings). On post-conviction review, the Nevada Supreme Court summarily affirmed its previous denial of Ybarra's venue claim.

posed . . . to expressions of opinion from both cranks and friends," and received anonymous letters. *Id.* at 353. The few comments reported in Ybarra's case—which were overheard sporadically by the jurors but not persistently directed at them in any systematic way—simply do not pose a comparable threat to jury impartiality.

**[7]** In short, the Nevada courts' denial of Ybarra's motion for a venue change involved neither an unreasonable determination of the facts nor an unreasonable application of federal law as defined by Supreme Court precedent existing at the time.[5] Therefore, we must deny Ybarra's claim for habeas relief on this ground.

## C

Ybarra's next certified issue on appeal is whether the district court erred when it denied claim 1 of his habeas petition by holding that a penalty-phase jury instruction given on an aggravating factor involving "depravity of mind," while unconstitutional, was harmless error. We affirm the district court's ruling.

## 1

One of the four aggravating factors found by the jury prior to its imposition of the death penalty on June 27, 1981, was that the murder "involved torture, depravity of mind, or the

---

[5]We note that Ybarra's briefing on the merits of this claim cites to a recent Supreme Court case, *Skilling v. United States*, 130 S. Ct. 2896 (2010), and that both sides cite to numerous Ninth Circuit cases. These citations are irrelevant to our analysis, which must turn only on Supreme Court precedent existing at the time the Nevada state court ruled on Ybarra's claim. *See Cullen*, 131 S. Ct. at 1399 (noting that under AEDPA, "[s]tate-court decisions are measured against this Court's precedents as of 'the time the state court renders its decision' " (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003))).

mutilation of the victim." As to the "depravity of mind" component, the jury was given the following instruction:

> The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent, which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

**[8]** However, prior to Ybarra's penalty phase trial, the United States Supreme Court had held that whether an offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" was an unconstitutionally vague aggravating factor when not given a limiting construction. *See Godfrey v. Georgia*, 446 U.S. 420, 422, 432 (1980); *see also id.* at 428-29 ("There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' "). We have already held that, after *Godfrey*, the very same Nevada jury instruction given in Ybarra's case is unconstitutional and contrary to clearly established federal law under AEDPA. *See Valerio v. Crawford*, 306 F.3d 742, 752, 755-56 (9th Cir. 2002) (en banc). Ybarra's penalty-phase hearing took place in 1981, after Godfrey was decided, and the Nevada Supreme Court affirmed the instruction on direct appeal in 1984 without considering *Godfrey*. Therefore, we agree with the district court that the state court decision was contrary to then-existing clearly established federal law.

**2**

**[9]** In general, "constitutional errors do not require reversal of a conviction, but are susceptible to harmless error review."

*United States v. Montalvo*, 331 F.3d 1052, 1056-57 (9th Cir. 2003). "The usual standard for harmless error on federal habeas corpus for state prisoners" is that of *Brecht v. Abramson*, 507 U.S. 619 (1993). *Valerio*, 306 F.3d at 762. *Brecht* applies here because an erroneous jury instruction does not "taint the trial 'from beginning to end' or undermine 'the framework within which the trial proceeds.' " *Montalvo*, 331 F.3d at 1057 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309-10 (1991)). Under *Brecht* we ask whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637.

[10] Our *Brecht* analysis in Ybarra's case follows the approach we adopted in *Valerio* for the same unconstitutional Nevada aggravating factor and jury instruction. We assess whether the vague construction of the "depravity" factor had a substantial and injurious effect or influence on the jury's decision to impose the death sentence, in comparison to what its decision would have been had it been instructed on a constitutionally narrowed version of the depravity factor. *See Valerio*, 306 F.3d at 762. Instead of being asked whether the murder "involved torture, depravity of mind, or the mutilation of the victim," the jury should have been asked whether the murder "involved torture, mutilation, or other serious and depraved physical abuse beyond the act of killing itself."[6] *See id.* As to the meaning of this narrowed construction, we have held that the following instructions on "torture" and "mutilation," which were given to Ybarra's jury, are constitutional:

> The essential elements of murder by means of torture
> are (1) the act or acts which caused the death must

---

[6]This narrowing construction of the depravity factor was provided by the Nevada Supreme Court in *Robins v. State*, 798 P.2d 558, 570 (Nev. 1990), which held that it complied with *Godfrey*. *See Valerio*, 306 F.3d at 751. In *Valerio*, we assumed for purposes of the *Brecht* analysis that this narrowed construction was constitutional, *see id.* at 762, and we do the same here.

> involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, persuasion or for any other sadistic purpose.
>
> . . .
>
> [T]he term "mutilate" means to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make imperfect.

*See Deutscher v. Whitley*, 884 F.2d 1152, 1162 (9th Cir. 1989), *vacated on other grounds sub nom. Angelone v. Deutshcer*, 500 U.S. 901 (1991). In addition, we have held that "the phrase 'beyond the act of killing itself' modifies all three conditions: torture *or* mutilation *or* depraved physical abuse." *Valerio*, 306 F.3d at 762 n.8.

**[11]** We believe that there is "fair assurance," *id.* at 762, that had jurors been instructed on the narrowed version of the aggravating factor, they would have nonetheless found that it applied. Griffith undoubtedly suffered mutilation, as the defense conceded at sentencing. She was burned so badly that most of her hair was gone, her eyes were nearly swollen shut, and a responding officer who knew her was unable to recognize her. There was also medical testimony at sentencing indicating that, had she lived, her face would have been "very difficult to reconstruct," and she "would have undergone finger and possibly forearm amputations" because of the depth of her burns. Crime scene investigators found the entire skin of one hand with fingernails still attached on the ground in one piece. These gruesome details make it clear that Ybarra's acts permanently and radically altered or destroyed parts of Griffith's body.

Relying on *Valerio*, Ybarra argues that, because the act of burning Griffith was what killed her, her burn-related injuries

cannot constitute mutilation "beyond the act of killing itself." In *Valerio*, we held that when a victim died from the cumulative effect of forty-five stab wounds, rather than the effect of any one single wound, a juror could reasonably conclude that none of the stab wounds constituted mutilation or serious physical abuse beyond the act of killing itself. *See* 306 F.3d at 762-63. In Ybarra's case, however, we hold that this "death by a thousand cuts" reasoning is inapposite. Although the horrible disfigurement Griffith suffered was a result of the same act that killed her, it was not a mere incident to her death. Even if Griffith died from the cumulative effect of her burns, we think it incontrovertible that she suffered destruction of her face and hands far more severe than what was necessary to cause her death. *See Vanisi v. State*, 933 P.3d 1164, 1168, 1172-73 (Nev. 2001) (holding that a finding of mutilation "beyond the act of killing itself" could be supported by medical testimony describing "extensive and severe injury" to the victim's face and head, when the cause of death was described as "multiple injuries to the skull and brain due to blunt impact trauma" such that it was not clear which blows actually killed the victim).

**[12]** In short, even if the unconstitutionally vague "depravity" aggravating factor had been appropriately narrowed, we are confident that the jury would nonetheless have applied it. Thus, the jury would have been faced with the same balancing determination it ultimately made—whether the four aggravating factors it found were outweighed by the mitigating evidence presented.[7] *See* Nev. Rev. Stat. § 200.030(4)(a). It most certainly would have reached the same result. Because the constitutional error did not have a substantial or injurious

---

[7]The other three aggravating factors were: (1) The murder was committed by a defendant who was previously convicted of a felony involving the use or threat of violence to the person of another; (2) The murder was committed while the defendant was engaged in the commission of forcible rape; and (3) The murder was committed while the defendant was engaged in the commission of kidnapping in the first degree.

effect or influence on the jury's imposition of the death sentence, it is harmless under *Brecht*.

## IV

Before discussing Ybarra's final certified claim of cumulative error, we first turn to those issues for which the district court denied a certificate of COA. Under AEDPA, a petitioner cannot appeal the district court's ruling on a particular issue without first obtaining a COA for that issue from either a district judge or a circuit judge. 28 U.S.C. § 2253(c); *Valerio*, 306 F.3d at 763. A COA should be granted if a petitioner can show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," or, in the case of a district court procedural ruling, reasonable jurists would find it debatable both "whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). Only after we have decided whether a COA should issue may we adjudicate a particular claim's merits. *Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003).

## A

Ybarra first seeks a COA on the issue of whether the district court improperly required him to abandon the unexhausted claims in his 2002 habeas petition. We deny a COA on this issue because we find that it is not reasonably debatable. A district court must be free to manage complex habeas corpus litigation by imposing reasonable constraints on the orderly presentation of the claims.

[13] If a habeas petition is "mixed" such that it includes both unexhausted and exhausted claims, a district court must dismiss it, leaving the petitioner an option to either abandon the unexhausted claims or return to state court to exhaust them. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). The Supreme

Court has made it clear that "it would be appropriate for an order dismissing a mixed petition to instruct an applicant that upon his return to federal court he is to bring *only* exhausted claims." *Slack*, 529 U.S. at 489 (emphasis added). This is exactly what the district court's 1993 order did. After noting that "a federal court may not address the merits of any grounds for relief if there are any unexhausted grounds before the court," the court stated:

> Petitioner is admonished that when a new federal petition for writ of habeas corpus is filed, it should contain only fully exhausted grounds for relief, and it should contain all (without exception) of Petitioner's claims for habeas corpus relief. Petitioner will not be given another opportunity to return to state court. Petitioner should therefore use this last opportunity to return to state court to exhaust all grounds for relief.

**[14]** Having thus informed Ybarra of the exhaustion requirement and the consequences of disregarding it,[8] the district court had the power to dismiss Ybarra's habeas petition if he failed to comply with its order. *See Slack*, 529 U.S. at 489 (noting that "[o]nce the petitioner is made aware of the exhaustion requirement, no reason exists for him not to exhaust all potential claims before returning to federal court," and the district court could dismiss his petition for failure to comply with the court's order under Fed. R. Civ. Proc. 41(b)). When Ybarra returned to district court with unexhausted claims in his 2002 petition, the district court appropriately allowed him to avoid the harsh consequence of outright dismissal of the entire petition by abandoning the unexhausted claims. *See Anthony v. Cambra*, 236 F.3d 568, 574 (9th Cir. 2000) ("[D]istrict courts must provide habeas litigants with

---

[8]We find entirely meritless Ybarra's contention that the language in the 1993 order was somehow inadequate to warn him that he would forfeit any unexhausted claims in the future.

the opportunity to amend their mixed petitions by striking unexhausted claims as an alternative to suffering dismissal."). Nothing the district court did was even remotely improper, much less an abuse of discretion.[9] *See Hearns v. San Bernardino Police Dept.*, 530 F.3d 1124, 1129 (9th Cir. 2008) (reviewing a Rule 41(b) dismissal for abuse of discretion).

Nor did the district court abuse its discretion when it denied Ybarra's Rule 59(e) motion for reconsideration, in which Ybarra argued that several of the claims he had abandoned following the district court's 2004 order had since been exhausted by the Nevada Supreme Court in a November 28, 2005, ruling. *See Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001) (reviewing the denial of a Rule 59(e) motion for abuse of discretion). A Rule 59(e) motion may be granted if "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Id.* at 740. Here, the district court reasonably determined that Ybarra failed to make the requisite showing. In particular, the evidence of exhaustion that Ybarra sought to present was not "newly discovered" for purposes of Rule 59(e) because Ybarra was aware of it almost one year prior to the district court's denial of his habeas petition on October 31, 2006. *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (finding evidence is not newly discovered, for purposes of a Rule 59(e) motion, if it was available prior to district court's ruling).

[15] Because it is not reasonably debatable that the district court's handling of the unexhausted claims in Ybarra's federal habeas petition was not an abuse of discretion, we deny the COA on this issue.

_____

[9]We note that Ybarra had already been given two chances to return to state court to exhaust his claims: once in 1987 after his first federal habeas filing, and again in 1993 after his second.

**B**

Ybarra also seeks a COA for two claims pertaining to statements the prosecutor made during closing arguments at the penalty phase. In his closing argument, the prosecutor referred to the victims of notorious Utah criminal Gary Gilmore, discussed several passages in the Bible, and described the infamous Kitty Genovese murder in New York, during which the victim was stabbed 17 times over a period of 35 minutes. The prosecutor then told the jury:

> Thirty-eight people witnessed at least part or all of the incident and not one called the police until she was dead. On the night of September 28th, 1979, Nancy Griffith died. There weren't thirty-eight people there to watch, but by sitting for two weeks through this trial, you, ladies and gentlemen, become the witnesses to a serious crime. The question now is how you respond? What will you do about it?

On state post-conviction review, Ybarra claimed that these remarks constituted prosecutorial misconduct and that his counsel had been ineffective in failing to object to them. The Nevada Supreme Court found that the prosecutor's remarks were improper because they discussed facts outside of the record, but that most of them had been invited by defense counsel's own improper and "far ranging" arguments, which included "a long discourse on Biblical subjects" and descriptions of executions of various persons, including Gary Gilmore. *Ybarra v. State*, 731 P.2d 353, 357-58 (Nev. 1987). The Court concluded that, in any case, "where, as here, evidence of a defendant's guilt is particularly overwhelming and the death penalty is particularly appropriate, prosecutorial misconduct may be deemed harmless error." *Id.* at 358. Accordingly, it held that "there is no reversible error, either in counsel's failure to object or in the prosecutor's improper remarks." *Id.*

Ybarra now asserts that the district court erred by (1) dismissing as unexhausted his claim of prosecutorial misconduct, and (2) denying his claim of ineffective assistance of counsel for failure to object to the prosecutor's statements.

**1**

**[16]** As to the prosecutorial misconduct claim, we grant the COA because the district court's dismissal for failure to exhaust was incorrect. The Nevada Supreme Court recognized that Ybarra had raised two claims arising from the prosecutor's closing statement: an ineffective assistance of counsel claim for failure to object to the improper statements *and* a prosecutorial misconduct claim. *See Ybarra*, 731 P.2d at 354 ("Ybarra now renews five of his claims of ineffective assistance of counsel at trial [including failure to object to prosecutorial misconduct], and his claim of prosecutorial misconduct."). It then concluded that no reversible error existed, "either in counsel's failure to object *or* in the prosecutor's improper remarks." *Id.* at 358 (emphasis added). Because the Nevada Supreme Court "actually passed on the merits" of both claims, *Greene*, 288 F.3d at 1088, those claims have both been exhausted. We reverse the district court insofar as it held to the contrary.

However, proceeding to review the state court record before us, we deny Ybarra's prosecutorial misconduct claim on the merits because the Nevada Supreme Court's decision was not contrary to or an unreasonable application of United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). The Nevada Supreme Court's 1987 ruling relied on *United States v. Young*, 470 U.S. 1 (1985). *Ybarra*, 731 P.2d at 358. *Young* held that inappropriate prosecutorial comments do not necessarily warrant reversal, but rather "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." 470 U.S. at 12. In *Young*, the prosecutor had stated that he personally believed in the defendant's guilt and had urged the jury to "do

its job." *Id.* at 17-18. The United States Supreme Court found that these statements constituted error, but did not "seriously affect[ ] the fairness of the trial," *id.* at 20, because they were understood as responses to improper remarks made by the defense. *See id.* at 17-18 ("Given the context of the prosecutor's remarks and defense counsel's broadside attack . . . we conclude that the jury was not influenced to stray from its responsibility to be fair and unbiased.").

**[17]** Under *Young*, it was not unreasonable for the Nevada Supreme Court to decide that, viewed in context, the prosecutor's improper statements—including his implied exhortation to the jury to "do its job" by reference to the Genovese case—did not constitute reversible error. The court reasonably determined that most of the statements were invited by the defense's closing statement, which included a lengthy, biblically based argument against the death penalty as well as several graphic descriptions of the executions of specific persons throughout history. Even one of Ybarra's attorneys later conceded that the defense had "opened the door" to the prosecutor's statements. *Ybarra*, 731 P.2d at 358. To the extent that Ybarra's briefing argues that the prosecutor "placed all of the weight of potential public opprobrium upon the juror's decision" by comparing the jury to the onlookers in the Genovese case, we note the defense also brought significant "extralegal" pressure to bear on the jury: defense counsel opined that the death penalty contravened the teachings of the New Testament and was opposed by Christian churches, and also suggested that jurors would be behaving "like blind cattle, following the law of the State" without regard to "what is true and what is correct" if they decided to "kill Robert." If, as Ybarra argues, the prosecutor's closing argument improperly equated the imposition of the death penalty with the prevention of an ongoing crime, we note that the defense's closing improperly equated following state law with murder.

Furthermore, we do not think the reasonableness of the Nevada Supreme Court's decision is impugned by its refer-

ence to the "overwhelming" guilt-phase evidence against Ybarra in its analysis of prejudicial impact of a penalty-phase error. Ybarra's jury was permitted to consider guilt-phase evidence at the penalty phase. Because this evidence was relevant to the jury's penalty-phase verdict, it was not inappropriate for the court to take its relative strength into account when assessing the prejudicial impact of the prosecutor's error. *See Young*, 470 U.S. at 19 (noting that the "overwhelming evidence" against the defendant "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations . . . ."); *see also Strickland v. Washington*, 466 U.S. 668, 696 (1984) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

Because the state court's conclusion that the prosecutor's improper remarks at closing argument did not constitute reversible error was not unreasonable under clearly established federal law, we deny habeas relief on this claim.

**2**

Ybarra also claims that his counsel was ineffective for failing to object to the prosecutor's improper statements. The district court denied this claim on the merits. Because reasonable jurists could not find the district court's resolution of this claim debatable or wrong, we deny the COA.

[18] In order to prevail on an ineffective assistance of counsel claim, a petitioner must show both that counsel's performance was deficient, and "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 at 687. Because the Nevada Supreme Court could have reasonably determined under *Young* that the prosecutor's improper statements did not "seriously affect[ ] the fairness of the trial," 470 U.S. at 20, it is clear beyond debate that defense counsel's failure to object to

those statements did not entirely "deprive [Ybarra] of a fair trial" as required to meet the prejudice standard under *Strickland*. *See Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995) (noting that the *Strickland* prejudice standard is more difficult for a defendant to meet than the "substantial and injurious effect or influence" prejudice standard for harmless error review). Therefore, no COA should issue for this claim.

## C

**[19]** Ybarra also seeks a COA on another ineffective assistance of counsel claim. He asserts that defense counsel was ineffective for failing to voir dire the jury on the insanity defense. The district court denied habeas relief on this claim on the merits. We deny the COA because the district court's resolution of this issue is not reasonably debatable.

Ybarra has not made the required showing of prejudice under *Strickland*, because he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense. *See Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) ("Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's [error], the jury panel contained at least one juror who was biased."); *Wilson v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999) (holding that counsel was not ineffective for failing to ask certain questions during voir dire when all jurors stated that they would be fair and follow the law as instructed, as required by *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961)). As noted in our discussion of Ybarra's venue claim, all of Ybarra's jurors indicated that they could render a fair verdict based on the evidence presented. We therefore decline to issue a COA for this claim.

## V

As we have now considered each of those claims of error which are properly before us, we turn to the final certified

issue on appeal: whether the cumulative effect of errors in Ybarra's state court proceedings warrants habeas relief. "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). We have granted habeas relief under the cumulative effects doctrine when there is a "unique symmetry" of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case. *Id.* at 933.

In Ybarra's case, we find no such symmetry of error. There were imperfections in Ybarra's trial, as there are in all trials, but these imperfections did not render his trial and sentencing "fundamentally unfair." *Id.* at 927 (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03 (1973)). The claimed errors regarding the composition of the rural, small-town jury did not amplify each other: the fact that a juror was acquainted with the victim or her family, for example, would not suggest that the juror would harbor any particular bias regarding insanity as a criminal defense. Nor did the claimed errors at sentencing have a synergistic effect. The effect of the improper jury instruction was to focus the jurors on the horrific nature of the murder; the effect of the improper prosecutorial statements was to focus the jurors on their role as community members. Furthermore, the defense was not prevented from presenting counterbalancing arguments on these points. Cf. *id.* at 930 ("A unique and critical thread runs through the trial errors in this case: *all* of the improperly excluded evidence . . . supported [the defendant's] defense that he had the requisite state of mind for first-degree murder; at the same time, *all* of the erroneously admitted evidence . . . undermined [his] defense and credibility and bolstered the State's case." (emphasis in original)).

[20] In short, the combined effect of the errors in Ybarra's case did not "infect[ ] the trial with unfairness" or render Ybarra's defense "far less persuasive than it might otherwise

have been" so as to violate due process. *Id.* at 927 (citations and alterations omitted). Therefore, habeas relief is not warranted on this claim.

## VI

We affirm the district court's dismissal and denial of Ybarra's habeas petition. Specifically, as to Ybarra's claim that the district court erred by finding certain of his claims procedurally barred by Nev. Rev. Stat. § 34.800, we affirm the district court. We reverse the district court insofar as it held that two of Ybarra's claims—his claim that he was deprived of his right to an impartial jury and his claim of prosecutorial misconduct—were unexhausted, but we deny both of these claims on the merits. As to Ybarra's claim regarding the "depravity" jury instruction, we affirm the district court's holding that the constitutional error was harmless. Finally, we affirm the district court's denial of Ybarra's cumulative error claim. We deny a COA on Ybarra's remaining claims.

The district court's ultimate judgment to deny Ybarra federal habeas relief is **AFFIRMED.**