22CA1728 Peo v Woodruff 10-24-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1728
Douglas County District Court No. 20CR422
Honorable Patricia D. Herron, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jennifer Lea Woodruff,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE FREYRE
Grove and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee.

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant.

¶ 1 Defendant, Jennifer Lea Woodruff, appeals her judgment of conviction following jury verdicts finding her guilty of reckless vehicular homicide, third-degree assault, reckless endangerment, and reckless driving. We reverse and remand for a new trial.

## I. Background

¶ 2 According to the trial evidence, on February 19, 2020, Woodruff drove herself and the deceased, coworker Christopher Roberts, from Colorado Springs to Westminster for a work conference. Both were teachers at Zebulon Pike Youth Services Center and were required to attend the conference the next day. The two were co-teachers, and Roberts had just returned to work that day from an emergency gallbladder surgery and asked Woodruff for a ride to the conference.

¶ 3 Woodruff drove a white Jeep north on I-25 and recalled drizzle changing to snow as she approached Monument Hill. Her last memory was of slowing down due to the weather, and her next memory was awakening in a hospital.

¶ 4 Several witnesses reported seeing a white Jeep approaching from behind them at a high rate of speed. This area of the highway was under construction and reduced to two lanes of traffic.

Witnesses described the Jeep weaving between cars and nearly striking them, while others moved to avoid being hit. The Jeep maintained a constant speed of approximately 100 miles per hour and sometimes straddled the center line between the two lanes.

¶ 5     The Jeep eventually struck the right rear corner of Joseph Medina's truck, causing the truck to spin out and pinball between the barriers on either side of the highway. Medina heard tires screeching and saw the Jeep approaching quickly from behind before hitting him. He suffered minor injuries from the accident. The Jeep hit a crash cushion, flipped, and flew over several cars. It hit the guardrail, which ripped off the roof, and landed upside down on the road.

¶ 6     After the crash, witnesses cut Roberts's seatbelt and removed him from the Jeep. Paramedics declared him dead at the scene. Woodruff was transported to the hospital where she was treated for a severe head injury. Trooper Botts interviewed Woodruff at the hospital, but she had no memory of the crash. Blood test results confirmed there were no drugs or alcohol in Woodruff's system. She suffered serious injuries, including a traumatic brain injury. She

remained in the hospital for six days and then was transferred to a rehabilitation facility for five days.

¶ 7     The prosecution charged Woodruff on April 22, 2020, and she was released on bond the next day. Two months later, Woodruff sought an explanation for her driving behavior and amnesia of the accident. Her sister Cindy[1], a registered nurse, referred her to a vascular neurologist, Dr. Mihaela Alexander. Dr. Alexander obtained a medical history from Woodruff and Cindy and conducted preliminary tests to rule out epilepsy and any cardiac condition. Woodruff's medical history revealed that she had experienced syncope (fainting) events throughout her life. These events were triggered by medical procedures and gore. But rather than going limp when she lost consciousness, Woodruff's body stiffened and convulsed, a condition called vascular vagal convulsive syncope. The body movements caused by convulsive syncope are often mistaken for a seizure.

---

[1] We refer to Cindy using her first name because she shares the same last name as Woodruff, and we mean no disrespect in doing so.

¶ 8     Woodruff said Roberts spoke of his gallbladder surgery before the accident.  Based on the negative test results, the absence of medications in Woodruff's system and Woodruff's complete amnesia of the crash, Dr. Alexander opined that Woodruff likely experienced a vasovagal syncope event triggered by Roberts's mention of his gallbladder surgery.  Dr. Alexander recommended further epilepsy testing and referred Woodruff to a neurologist with an epilepsy specialty, Dr. Rick Clemmons.

¶ 9     Dr. Clemmons ordered a 48-hour epilepsy test that was also negative.  Like Dr. Alexander, he opined, based on her medical and family history (Woodruff's father suffered from severe vasovagal syncope), as well as the test results, that Woodruff experienced a convulsive syncope event.  As a precautionary measure, he prescribed a low dose of an anti-seizure medication and advised her, according to the standard protocol, not to drive for three months.

¶ 10     At trial, the prosecution introduced the testimony of witnesses who described the highway and weather conditions, the excessive speed at which the Jeep was travelling, and its weaving around cars up to the crash.  One witness described Woodruff sitting upright

with her hands at ten and two and the passenger with his back turned as if he was arguing with the driver.

¶ 11    Trooper Trent Waters testified as an expert in crash investigation and reconstruction. After ruling out any mechanical defects with the Jeep, he analyzed data from the Jeep's "black box", which contained speed, steering movements, and braking data for the five seconds before the crash. He then fed the information into a software program that produced an animation of the crash. The data revealed steering wheel movement consistent with weaving, a depressed accelerator, no application of the brakes, and a speed of over one hundred miles per hour at the time of the crash. He opined that the crash was caused by Woodruff "intentionally driving her vehicle in excess of the posted speed limit of 45, traveling at 103-106 miles per hour, while steering, to avoid traffic and maneuver in and out of traffic."

¶ 12    The prosecution charged Woodruff with reckless vehicular homicide, third degree assault, reckless endangerment, and reckless driving. The prosecutors argued that Woodruff enjoyed driving fast, weaved in and out of cars while speeding, and recklessly sped through a construction zone and caused the

accident. They questioned her amnesia of the event and argued that she saw the neurologists and created the vasovagal syncope defense only after she had been charged with the crimes. Woodruff argued that a convulsive syncope event caused her to lose consciousness, explained why the brakes were never applied, and explained why she had no memory of the crash. The jury convicted her as charged.

¶ 13     The trial court found extraordinary mitigating circumstances and sentenced Woodruff to one year in the custody of the Department of Corrections for reckless vehicular homicide, and to a concurrent one year in jail for third degree assault. The court merged the remaining counts into the vehicular homicide conviction.

¶ 14     Woodruff challenges her convictions on four grounds, asserting the trial court erroneously: (1) precluded the admission of a prior inconsistent statement; (2) permitted repeated prosecutorial misconduct; (3) permitted Trooper Waters to opine on her intent at the time of the crash thereby usurping the jury's role; and (4) instructed the jury using a civil jury instruction taken from 1970s civil cases. She also asserts cumulative error.

¶ 15 Because we agree that the court erred in refusing to admit Woodruff's prior inconsistent statement, a key component of her defense, we reverse her convictions and remand for a new trial. Additionally, we address those portions of her prosecutorial misconduct argument directly related to that statement that contributed to the error's reversal. Finally, because they are unlikely to arise in the same context on remand, we do not address her expert and instructional allegations.

## II. Prior Statement

¶ 16 Woodruff contends that the trial court erroneously precluded (as self-serving hearsay) the admission of her statement to her sisters, shortly after the accident, that Roberts had mentioned his gallbladder surgery before the crash. She argues that this evidentiary error, when combined with pervasive prosecutorial misconduct that denigrated the defense and asserted that it was largely a fabrication, denied her a constitutionally fair trial. We agree.

### A. Additional Facts

¶ 17 While Woodruff was still hospitalized, Cindy pushed her to recall what had caused the crash. While Woodruff could not

remember the crash itself, she told Cindy and Lisa Tsiao (another sister) that Roberts had said something about his gallbladder surgery before the crash.

¶ 18 During direct examination, defense counsel asked Tsiao whether she had any conversations with Woodruff about what happened. As Tsiao responded, the prosecutor objected as self-serving hearsay. The court allowed the question and Tsiao said, "[s]he said that she didn't remember the actual accident. I asked her – tried to draw out from her what was going on, and she said that they were talking about Chris's gallbladder surgery, I guess; that he had a drain."

¶ 19 The prosecutor again objected as self-serving hearsay, and the court sustained the objection.

¶ 20 Counsel next attempted to elicit the statement from Cindy in the following colloquy:

> DEFENSE COUNSEL: What was the next question you asked her?
>
> CINDY: I asked her – it's what she said. She continued on with that. And I said, "Do you remember anything else?" And she answered. I don't know if I can say what she said.

DEFENSE COUNSEL: Did she tell anything about a conversation she had with Mr. Roberts?

¶ 21    The prosecutor objected and argued that Cindy's answer called for hearsay.  The court sustained the objection and instructed Cindy that she could answer the question without revealing the conversation.  Cindy answered, "Yes, she did."  Counsel asked the court if he could elicit the statement.  At a bench conference, counsel argued that the prosecution had asked another witness, Trooper Botts, whether Woodruff had volunteered information about the crash.  He wanted to establish that Woodruff would have responded with this information.  The prosecution objected as self-serving hearsay, and the court sustained the objection.

¶ 22    Woodruff testified that she remembered nothing about the accident.  On cross-examination by the prosecutor, she said she did not remember what Roberts said before the accident.  Following the doctors' testimony, defense counsel asked to recall Cindy to elicit the statement as a prior inconsistent statement, and the court refused the request.

## B. Standard of Review and Applicable Law

¶ 23    We review a trial court's evidentiary rulings for an abuse of discretion. *Russell v. People*, 2017 CO 3, ¶ 5. A trial court abuses its discretion when it misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Baker*, 2021 CO 29, ¶ 29. A trial court's exclusion of a witness's prior inconsistent statement is reviewed for nonconstitutional harmless error. *People v. Salas*, 2017 COA 63, ¶ 32. An error of nonconstitutional dimension is prejudicial when there is a reasonable probability that it contributed to a defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial. *People v. Casias*, 2012 COA 117, ¶61.

¶ 24    Hearsay is "a statement other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay evidence is inadmissible unless it fits one of the exceptions identified in the Colorado Rules of Evidence. *See* CRE 803, 804. A statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement and the statement is inconsistent with their testimony. CRE 801(d)(1)(A). If

10

a witness does not remember a prior statement, the statement is admissible as a prior inconsistent statement. *People v. Thomas*, 2014 COA 64, ¶ 20; *People v. Baca*, 633 P.2d 528, 529 (Colo. App. 1981).

¶ 25    Section 16-10-201(1), C.R.S. 2024 permits the use of a prior inconsistent statement to prove the truth of the matter asserted so long as the statutory foundational requirements for substantive admissibility have been satisfied. *Montoya v. People*, 740 P.2d 992, 998 (Colo. 1987). A prior inconsistent statement is admissible to impeach a witness's testimony and to establish a fact if the witness (1) was given an opportunity, when testifying, to explain or deny the statement; or (2) is still available to give further testimony in the trial. § 16-10-201(1)(a); *see also Thomas*, ¶ 20 (if a witness does not remember a prior statement, the statement is admissible as a prior inconsistent statement).

¶ 26    Colorado law contains no categorical bar to the admission of a defendant's self-serving hearsay statements. *See People v. Vanderpauye*, 2023 CO 42, ¶ 4. Accordingly, if the proffered statement meets an exception to the hearsay rule, it may be admitted, subject to CRE 403. *See id.* at ¶ 28.

## C. Analysis

### 1. The Error

¶ 27    To begin, no one disputes that Woodruff's statement to her sisters was an out-of-court statement offered for its truth. Nonetheless, we conclude that the trial court abused its discretion by excluding Woodruff's statement as self-serving hearsay and that it should have been admitted as a prior inconsistent statement. The record shows that Woodruff recalled no details of the crash or the specifics of her conversation with Roberts immediately before the crash. While counsel initially sought the statement's admission to show what she would have told Trooper Bott if asked, following Woodruff's inability to recall making the statement, he then sought to admit it as a prior inconsistent statement by recalling Cindy to testify. Therefore, we reject the People's argument that Woodruff's purpose in admitting the statement was "not for impeachment."

¶ 28    Woodruff's testimony that she could not recall her prior statements amounted to a denial that she made them and thus, constituted an inconsistent statement. *Thomas*, ¶ 20. Therefore, the trial court erred when it precluded counsel from admitting the

statements through Cindy, who was available to give further testimony. § 16-10-201(1)(a).

## 2. The Remedy

¶ 29    Having concluded an error occurred, we must determine whether it requires reversal. The People assert the error was harmless and argue that the prosecution presented overwhelming proof of Woodruff's guilt through the accident reconstruction expert's testimony about the black box data, which showed accelerator pressure from full throttle to 66% throttle and steering variations from two degrees left to thirty-five degrees right, thereby proving the driver was in control of the Jeep. They further argue that this data was consistent with the witnesses who observed Woodruff's driving and with the expert's opinion that Woodruff's driving was intentional.

¶ 30    Woodruff contends the statement, and particularly its timing, was crucial to her defense and that the court's error deprived her of a full and fair defense. We need not decide whether the statement alone requires reversal because even assuming the error was harmless, we conclude, consistent with Woodruff's final argument, that the cumulative error in precluding this statement and the

numerous unpreserved instances of prosecutorial misconduct specifically related to it substantially influenced the verdict and affected the outcome of the trial. *Hagos v. People*, 2012 CO 63, ¶ 12.

¶ 31 Cumulative error is a question of law that we review de novo. *Howard-Walker v. People*, 2019 CO 69, ¶ 22. "We will reverse for cumulative error where, although numerous individual allegations of error may be deemed harmless and not require reversal, in the aggregate those errors show prejudice to the defendant's substantial rights and, thus, the absence of a fair trial." *People v. Gallegos*, 260 P.3d 15, 28-29 (Colo. App. 2010); *Howard-Walker*, ¶ 23.

¶ 32 Cumulative error occurs when "there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011); *see also Parle v. Runnels*, 505 F.3d 922, 930 (9th Cir. 2007) (reversing for cumulative error and finding "[a] unique and critical thread runs through the trial errors in this case: *all* of the improperly excluded evidence . . . supported [the defendant's] [state of mind] defense . . . at the same time, *all* of

14

the erroneously admitted evidence . . . undermined [his] defense and credibility and bolstered the State's case").

¶ 33 We begin with Woodruff's defense. She never disputed the black box data and instead, argued that the acceleration and steering fluctuations were equally consistent with her having experienced a convulsive vasovagal syncope event and with Roberts grabbing the steering wheel when she lost consciousness. She also argued that the data showing the brakes were never applied supported a syncope event. She argued there was no reason for her to have driven recklessly given the weather conditions, and that the only reasonable explanation for her driving behavior and inability to remember what happened was the convulsive vasovagal syncope event.

¶ 34 We find reversible error for two reasons.

¶ 35 First, the prosecution relied heavily on the timing of Woodruff's claim that she suffered a medical event as evidence of her guilt in closing argument. In the first closing, the prosecutor argued that Woodruff had no memory of the gallbladder story at the hospital, and that "[t]hen, with Dr. Clemmons, we get the gallbladder story that she didn't tell the other doctor, Dr.

Alexander." He then said, "[I]n front of you, [] she had no memory of ever, ever hearing a gallbladder story. Now that is some select[ive] memory. That certainly conforms to the doctor's report but allows her not to comment on it here. *And she went to these doctors to create a defense. She testified for you to bolster that defense.*"

¶ 36 Later, the same prosecutor conceded that Dr. Clemmons said it was likely Woodruff experienced a syncope event, and then argued, "But what did he base that on? The gallbladder story, the description of the gallbladder. He said that was key to his diagnosis, that trying to remember was key, *that gallbladder story that she did not remember after the crash, that she remembered only conveniently after making appointments with doctors, after being charged in this case, that she conveniently did not remember in her testimony ever saying during the trial.*"

¶ 37 During rebuttal closing, a different prosecutor urged the jury to remember what it heard from witnesses versus the lawyers. He then said, "And, boy, is that true in this case, ladies and gentlemen because you have heard the references to gallbladder surgery and vasovagal syncope a lot in the last four days. Because defense

16

counsel says it often enough, all of a sudden it becomes true. And that's just not supported by the evidence." He followed by saying, ". . . *things that counsel asserts that simply aren't supported by the evidence; that Chris was talking about his gallbladder surgery at the time of the crash. Did a single witness, including the defendant, say that's what happened? No.* You swore to base a decision on the evidence. There's none. The defendant fainted. There's actually no evidence that happened here."

¶ 38     The prosecutor then argued, ". . . the defendant has a previously undiagnosed medical condition. Still not sure whether it's really a fainting disorder or seizure disorder or something else, so we'll call it a fraser." He later argued, "A fraser disorder, for which there is no objective medical evidence, all of her testimony is gone. All of it. *That she's never sought treatment for or been diagnosed with it before, before she was charged with this crime, never, until coincidentally, about two months after she is charged with vehicular homicide, she goes to a doctor, frankly.*" He then argued, "Because one option you have is that is not a thing; that she doesn't have a tendency to have seizures, *this is fabricated by the defense, or by the defense witnesses.*"

¶ 39    Second, numerous instances of unpreserved prosecutorial misconduct during opening statements and closing arguments specifically related to the medical evidence and the defense's theory contributed to the prejudice, including:

- The prosecutor's assertion that the sisters' testimony was very consistent and described Woodruff's syncope as her going "limp" when the record shows that both sisters described Woodruff's syncope events as convulsive and with her body stiffening. *See People v. Fierro*, 651 P.2d 416, 417-18 (Colo. App. 1982) (a prosecutor may not misrepresent the facts to the jury).

- The prosecutor's characterization of convulsive vasovagal syncope as a "fraser" when the unrefuted medical testimony ruled out a seizure disorder and established vasovagal syncope as Woodruff's medical diagnosis. *Id.*

- The prosecutor's argument that Dr. Clemmons was the only witness to whom Woodruff mentioned Roberts's gallbladder statement when the record shows that Dr. Alexander knew of and considered this fact and when the prosecutor knew she had said the same to her sisters at the hospital. *Id.* (improper

18

to misstate facts and for a prosecutor to make arguments in closing he knows is refuted by evidence he sought to exclude).

- The prosecutor's description of Dr. Alexander's testing and concluding, "That doesn't make me feel good in the medical diagnosis." *See People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006) (misconduct for a prosecutor to refer to facts not in evidence or make statements reflecting his personal opinion or personal knowledge).

- The prosecutor's description of the people he encounters in his work saying, "I want to give you another saying, and I can't actually figure out who this is ascribed to, but it's [not] important. 'Don't expect a rational reason for an irrational act.' You know, unfortunately, the business that I am in as a prosecutor deals with a lot of people who do a lot of terrible things. And a lot of times they regret it afterward. And they almost never have a good reason to do it. People do stupid things. People do stupid things they regret later. People do stupid things they don't remember later – I've got a few younger people here on the jury – but that doesn't mean that at the time they're doing it they didn't know they were doing

19

it." *See id.* (personal opinions improper); *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005) (noting that improper assertions of personal knowledge carry much weight against an accused when they should carry none).

- The prosecutors' characterization of the defense theory as an "attempt[] to dodge responsibility for his death," and "an insult to [Roberts]"; as "requiring incredible mental gymnastics"; as "a story only told by defense counsel"; as a "façade"; as requiring "flights of fancy to buy"; as "baffling"; as "ridiculous"; the prosecutor's description of her condition as a "special kind of unconsciousness"; his description of defense counsel's demonstration of what could have occurred during the syncope event as "distracting performance art"; and the prosecutor's argument that to acquit Woodruff, the jury had to "believe her story," followed by a series of events comprising that story, and concluding with, "And ladies and gentlemen, if you believe that, I've got some ocean front property in Arizona to sell you. That's silly." *See People v. Denhartog*, 2019 COA 23, ¶ 52 (misconduct for prosecutor to make remarks denigrating the defense); *People v. Trujillo*, 2018 COA 12, ¶ 44

(misconduct to call defense arguments "completely ridiculous" and "preposterous"); *People v. Coria*, 937 P.2d 386, 388, 391 (Colo. 1997) (prosecutor's references to "Theatrics 101," "smoke and mirrors," and "diversionary tactics" are misconduct when used to attack or mock defense counsel); *People v. Jones*, 832 P.2d 1036, 1038 (Colo. App. 1991) (misconduct to call defense theory "insulting"); *United States v. Reed*, 724 F.2d 677, 681 (8th Cir. 1984) (misconduct for prosecutor to argue that to acquit the defendant the jury had to find the defendant was telling the truth and all the government witnesses were lying because it was a distortion of the government's burden of proof); *People v. Scheidt*, 526 P.2d 300, 302 (Colo. 1974) (misconduct to argue that mental condition defense was a "miscarriage of justice").

¶ 40    We conclude that the cumulative effect of the court's evidentiary error and the numerous instances of prosecutorial misconduct related to it and to Woodruff's theory of defense substantially influenced the verdict and affected the outcome of the trial. Accordingly, we reverse Woodruff's convictions and remand the case for a new trial.

¶ 41    While we need not address the remaining allegations of prosecutorial misconduct, we caution counsel against using analogies in arguing the evidence as they may alter or lower the burden of proof. *People v. Cuellar*, 2023 COA 20, ¶ 68. Similarly, we caution the court against using jury instructions crafted from case law. *See People v. Espinosa*, 2020 COA 63, ¶ 15, n.1 ("[W]e agree with Espinosa that crafting jury instruction language by quoting from case law is 'generally an unwise practice,'" and "is particularly risky when the language from which the jury instruction is crafted does not come from a case involving a jury instruction issue.") (citing *Evans v. People*, 706 P.2d 795, 800 (Colo. 1985)); *People v. Chirico*, 2012 COA 16, ¶¶ 10-15 (finding error in instructing jury using a presumption instruction from a defense of property case in a self-defense case).

### III.    Disposition

¶ 42    The judgment is reversed, and the case is remanded for a new trial.

JUDGE GROVE and JUDGE LUM concur.